# CHARLESTON.

FERNE BURNSIDE KRODEL *v.* BALTIMORE & OHIO RAILROAD COMPANY

(No. 4969)

Submitted April 29, 1925.   Decided June 9, 1925.

1.  RAILROADS—*Traveler May Anticipate Train Will Give Statutory Warning and Will Not Exceed Speed Limit; Failure to Give Statutory Warning or to Obey Speed Ordinance Considered in Determining Negligence in Operating Train.*

    A traveler approaching a railroad at a highway crossing has the right to anticipate that trains nearing the crossing will give the warning signals prescribed by statute, and that while in the limits of a city or town they will not exceed the limit of speed prescribed by the municipal ordinances thereof; and if it appears that those in charge of a train which collided with an automobile at a crossing, failed to obey the provisions of the statute or ordinance, such omission may be considered along with all other facts in the

case in determining whether the railroad company was negligent in the operation of its train.    (p. 379.)

2.  SAME—*Traveler's Negligence Generally Question for Jury.*

A traveler approaching railroad tracks at a crossing is not required under all circumstances to stop, as well as look and listen before attempting to cross the tracks.  Whether one has been negligent in failing to stop is generally a question for the jury, though in some cases the duty to stop becomes so apparent that failure to do so is legal negligence. (p. 383.)

3.  SAME—*Automobile Driver Must Exercise High Degree of Ordinary Care; Trainmen Must Give Statutory Warning; Speed of Train and Care Must Be Commensurate With Danger.*

The driver of an automobile should approach a railroad crossing with a high degree of ordinary care and caution. Safety for his own life, as well as the lives of the operators and passengers on the train demand it.  On the other hand, it is the duty of the trainmen to give notice of the approach of the train required by statute, and at city crossings where the surroundings are such as to make it peculiarly dangerous, the speed of the train and care in the approach must be commensurate with the danger.    (p. 384.)

4.  SAME—*Automobile Driver Held Guilty of Contributory Negligence.*

At a street crossing there is a clear view of the railway tracks in either direction for a long distance after the traveler on the street has come within 40 feet of the crossing. At a point on the street 43 feet from the crossing the view of the track in one direction is obstructed so that the track can be seen for a distance of about 170 feet only.    The driver of a closed automobile approached this crossing at a speed of about 10 miles per hour, and looked for an approaching train at the point where she could see about 170 feet of track; not seeing a train within that distance, she drove onto the crossing without again looking in that direction and without lessening her speed, where she collided with the engine of a rapidly moving passenger train, and was injured.    Four persons immediately across the track who had stopped to let the train go by tried to warn her of the danger by waving her back, but she did not see them. There was positive evidence that the automatic engine bell was ringing and continued to ring until after the collision.

Held:   The trial court did not abuse its discretion in setting
aside a verdict in her favor, his action being warranted on
the ground of contributory negligence.   (p. 386.)

5.   NEGLIGENCE—*Question of Contributory Negligence for Court.*
Where the facts which control are not disputed and are
such that reasonable minds can draw but one conclusion
from them, the question of contributory negligence barring
recovery is one of law for the court.   (p. 386.)

Error to Circuit Court, Mason County.

Action by Ferne Burnside Krodel against the Baltimore
& Ohio Railroad Company.   The trial court set aside a ver-
dict in favor of plaintiff, and she brings error.

*Affirmed.*

*Hogg & Hogg, Somerville & Somerville,* and *C. M. Hanna,*
for plaintiff in error.

*B. H. Blagg, Lewis H. Miller, Marshall & Forrer,* and
*S. P. Bell,* for defendant in error.

*Steptoe & Johnson,* counsel amici curiæ.

LIVELY, PRESIDENT:

Plaintiff sues the Baltimore & Ohio Railroad Company and
Joseph Lane, one of its engineers, for personal injuries sus-
tained when the automobile in which she was driving col-
lided with defendant company's locomotive at a highway
crossing in the city of Point Pleasant.   The circuit court set
aside the verdict for $5000. in her favor and she brings error.

At the time of the injury plaintiff was seventeen years old,
unmarried, and, in company with a girl companion, was
driving a Ford sedan on Poplar Street, at a speed variously
estimated at from ten to twenty miles per hour; the best
evidence indicates that the lower estimate is more nearly cor-
rect.   Her general course was northerly, as the street  on
which she was riding is the sixteen foot concrete roadway
extending north and up the Ohio river from Point Pleasant.
As shown by a map introduced in evidence by defendants,
Poplar Street begins at Fourteenth Street and runs prac-
tically parallel to the railway a distance of something like
1900 feet, at which point by a sweeping curve to the left or

west it turns towards the track and crosses it at almost a right angle. The day was fair and cool, the 23rd of December, 1920, and plaintiff was in full possession of her faculties and had the benefit of a year's experience in driving automobiles. Defendants say they were free from fault and that plaintiff's contributory negligence was the proximate cause of her very serious injuries. Judging by the verdict, the jury held a different view, but the trial court set that verdict aside, and while the court assigns no reasons for its judgment, the argument of counsel, and the facts of the case show clearly that the decision was on the ground that plaintiff's contributory negligence was established as a matter of law. That proposition will therefore be the chief matter for discussion.

However, the negligence of defendants should be considered. The declaration alleges: (1) defendant's alleged careless and negligent omission to sound the bell or blow the whistle as required by law when approaching the crossing, and (2) the running of the locomotive and train at a speed in excess of that prescribed by an ordinance of the City of Point Pleasant. The ordinance referred to fixes the speed at which defendants should have run at 10 miles per hour, and there is evidence that the train in question was going anywhere from 25 to 35 miles per hour when it reached a point 700 or 800 feet south of the crossing, and was going at from 12 to 20 miles per hour when the crossing was reached. The violation of the ordinance is apparent. As to the whistle and bell the evidence is not so clear. There seems to be no doubt that the whistle was blown, but as to just where, or how many blasts were given, we can not positively state. Quite an array of witnesses, including not only members of the train crew, but three or four persons who were in the vicinity, testify that the whistle was blown as the train passed the Malleable Iron Works and the watering tank which stand about 700 feet south of the crossing, but these same witnesses have different recollections as to the number and length of the blasts. All of the train crew are certain that the regular crossing signal, two long and two short blasts were blown; others testify that they heard one long

blast. One person so testifying appeared as a witness for plaintiff, and one Windsor, who also testified for her and who was following her in another automobile, states that he heard two or three blasts in quick succession when the train was perhaps 200 feet from the crossing, and that he immediately recognized that plaintiff was in danger. Nineteen witnesses, some introduced by plaintiff, heard the whistle sounded; while five or six witnesses did not hear it. Plaintiff and her companion in the closed car did not hear it. That the whistle was sounded 700 feet or more from the crossing, there can be little doubt. The number of blasts given is in controversy, and the question is, whether the statutory notice was given; that is, whether the blowing of the whistle or ringing of the bell was kept up long enough to give warning of the train's approach to those persons at the crossing. The engineman and fireman swear that the automatic electric bell on the engine was set ringing upon leaving the station at Point Pleasant and was kept ringing through the town until after the accident occurred when it was stopped by the engineer. Gladys Hicks who saw the accident heard the bell ringing as the engine approached the crossing. Others heard the bell. Other witnesses did not hear the bell. No one says it was not ringing. It is difficult to see much conflict in the evidence as to the ringing of the bell. The evidence that it was ringing was positive; while the evidence that it was not ringing was negative. *Cavendish* v. *Ry. Co.*, 95 W. Va. 490.

The jury were correctly instructed that the law of this State (Barnes' Code, 1923, ch. 54, sec. 61) prescribes that a locomotive shall ring its bell or sound its whistle at a distance of not less than 60 rods from a public street crossing, and that such warning shall be continued for a time sufficient to give due notice of the approach of such train before such crossing is reached, and that if any person or corporation operating a train neglects to perform this duty, such omission constitutes negligence, and if a person is injured by reason of such negligence as the proximate cause thereof, he is entitled to recover damages commensurate with the injury.

The jury were also charged relative to the operation of the

train at a speed in excess of that prescribed by the ordinance, as follows:

> No. 10.  ''The jury are hereby instructed that the mere running of a train in violation of an ordinance of a city or town is not per se negligence, but if the jury believe from the evidence in this case that the train that struck the automobile in which the plaintiff was riding at the time she was injured was running at a greater rate of speed than that prescribed by the city ordinance of Point Pleasant offered in evidence in this case the jury may consider this fact along with the other facts and circumstances of the case in determining whether or not the defendants were negligent in operating said train which struck the said automobile in which the said plaintiff was riding.''

When we say that this instruction adequately and accurately covers the principles applicable, we have sufficiently announced our views on the proposition. They are supported specifically by the case of *Southern Railway Co.* v. *Stockdon,* 106 Va. 693, 56 S. E. 713, and seem to us to be sound in every respect. We are aware that some courts hold to the view that the violation of a speed ordinance by a train is negligence per se,—a proposition not insisted upon by plaintiff in this case,—but we think the correct principle is the one stated in the instruction above, and approved by the Supreme Court of the United States in the case of *Grand Trunk Railway Co.* v. *Ives,* 144 U. S. 408, as follows:

> ''The running of a railroad train within the limits of a city at a greater speed than is permitted by the city ordinances, is a circumstance from which negligence may be inferred in case an injury is inflicted upon a person by the train.''

For the proposition that, as a general rule, a traveler may presume that a train will not exceed the speed ordinances of a city in passing over crossings within the city limits, and he has a right to anticipate compliance with such ordinances by those in charge of an approaching train, see *City of Elkins* v. *Western Maryland Railway Co.,* 76 W. Va. 733, 86 S. E. 762, 1 A. L. R. 198, as well as a monographic note in 24 L. R. A. (N. S.) at page 493.

As we have given our approval to the instruction quoted above, we think the foregoing argument in support of it is not improper. While the evidence preponderates in favor of defendant that the whistle was sounded at least by one blast seven or eight hundred feet from the crossing and that the bell was automatically ringing all the while, the jury may have found that the rate of speed at that particular place in violation of the ordinance was negligence.

As we have said, the jury found from all the circumstances that defendants were negligent; we therefore pass to the matter which is of chief consequence in this record, that is; the alleged contributory negligence of the plaintiff.

We have already indicated something of the geographical setting of this accident. Plaintiff had driven northward from the center of the city practically the full distance of Poplar Street to the bend in the road; the railroad lay to her left and was distant several hundred feet along this course, and while it is not shown positively that her view of the tracks was obscured along the way, it is shown that the space between the highway and the railway was built up not only with residences, but in several places with industrial buildings of considerable size. It appears that she did not drive near the station at the beginning of the trip, and there is nothing to indicate in the slightest degree that she had any actual notice that a train was on the way. She was familiar with the conditions of travel in the locality, and while she makes no statement relative thereto, the fact is that the train which struck her was running about 19 minutes late when it left the station. The windows in her car were closed, and she probably engaged in conversation with her companion from time to time. As she rounded the bend in the road to her left she had a view of the crossing straight ahead one hundred feet, perhaps more. She could see northward along the line of the railway for a long distance. To her left, southward, however, her view was totally obstructed by a high bank ascending from the roadway. At a point 95 feet from the crossing her view to the south was still obstructed by a two story dwelling, and further along by another struc-

ture, a small store building standing about 43 feet from the track. At a point 43.9 feet from the center of the crossing (defendant's measurement) she was clear of the store and had an open view both to her right and left. At 40 feet from the crossing the view was clear for about 475 or 500 feet to the left from which direction the train was coming.

She was driving, according to the statement of Windsor, who followed in another car, about ten miles per hour when she neared the crossing. Windsor had driven behind her for some distance and was in an excellent situation to judge her rate of speed. Witnesses who drove up from the opposite direction and who had stopped to let the train go by and who viewed the accident from the other side of the crossing placed a higher estimate on her speed. She says that as she rounded the curve, she looked up the track to her right, and

> "When I got where I could get a view of the railroad track on the left hand side of the road looking down, I looked down, and that was *almost right at the edge of the little store building there;* and then as soon as I looked down and saw there was no train, why, I turned my head up the track, and in a few seconds in two or three seconds, I guess it was—I was hit."

Windsor confirms the plaintiff to the extent that he testified he saw her look up the track. He was, it would seem, about 75 feet behind her at the time. The witnesses who approached from the opposite side of the crossing think she looked straight ahead as she came toward the crossing, one of them stating that she and her companion seemed intent upon something at the bottom of their car. John McDaniel, who passed plaintiff at a point about the Malleable Iron Works says: "They was driving like anyone else," at a speed of from 12 to 15 miles per hour, and seemed to be smiling.

There is no contention that plaintiff stopped before attempting to cross the tracks, but Windsor testifies that she slackened her speed in approaching the crossing. This is disputed by Fowler, one of those who drove up to the tracks from the opposite side. He says he didn't see her look in either direction, that she was not making any attempt to slow

up, and that realizing she was in danger of being sruck by the train, he motioned his hand as a signal to her to stop. He says he was about 15 or 20 feet from the crossing at the time. Two girls who drove up along side Fowler also gave warning signals with their hands. Plaintiff apparently saw none of these warnings, nor the train, and her car was struck by the pilot of the locomotive, carried for a distance of about forty feet and both she and the girl with her were seriously injured. The amount of the verdict is not in controversy.

A mental vision of the picture shows a clear winter day on which plaintiff and her girl companion in a closed car are approaching at right angles a grade crossing 100 feet away at a speed of ten miles or more an hour and unaware of the approach of the passenger train and, to those observing her, giving no heed to her danger. Four persons were immediately across the track and in the street facing her, having stopped their cars in order to allow the train to pass. They had heard the warning signal and they saw the train coming. Many other persons in the near vicinity had heard the train blow for the crossing. The bell was ringing. The speed of the train was greater than that allowed by the city ordinance. Following her about 50 or 60 feet behind two other persons in a car travelling at about the same speed heard the train and saw her danger. Those opposite her in the street are waving their hands to attract her attention to the danger. All see the danger except plaintiff and her companion. The engine and car of plaintiff strike each other at the crossing, the side of the cow catcher nearest her being the place of impact. Thus the picture. Why did not plaintiff see her danger as others saw it? Why did she not hear as others heard? Did she use reasonable precaution for her safety under the circumstances? In short, was she guilty of what the law terms ''contributory negligence.'' She says she listened and did not hear; looked and did not see. To the north she could see and did see the railroad track for a long distance when she rounded the curve about 100 feet from the crossing; and after she rounded the curve and moved straight away to the track she could see and did see the track was clear to the north viewing it between a house and barn on her right. No

danger was in that direction. To the left her view of the track on the south was obstructed until she passed the little store building on her left which stood back about 43 feet from the track. Between this store building and the track and abutting on the track was a driveway which extended down the track to the lumber plant about 280 feet away. She says she looked in this direction (down the track) "when I got almost to the edge of the little store to the left hand side of the road." She saw no train, although she could see down to some place near the lumber plant. She gave but a glance in that direction and then turned her head and looked up the track until she met the train at the crossing, and never knew what struck her. It is clear that by looking down the track after passing the store house on her left two or three feet she could have seen the track to the southward a distance of four or five hundred feet. If she was travelling at ten miles per hour she would travel approximately 15 feet per second and would have passed the crossing in three seconds. A measurement of her vision to the southward down the track from the point about the edge of the store building which she afterwards pointed out as the point from which she looked, was estimated by her father to be 170 feet, although she said she saw down to about the lumber plant. If the train was not within her vision then, it could not have traversed that distance in time to meet her at the crossing, according to the estimates of the train's speed at that time. What was the evidence as to the speed of the train as it neared the approach to the crossing? Windsor, plaintiff's witness, says it was running close to 20 miles per hour, and Fowler, defendant's witness, says from 15 to 20 miles per hour. Other witnesses say that when it was at the Malleable plant the speed was at a greater rate estimated by them at from 25 to 30 miles per hour, but the evidence is uncontradicted that the service brakes were applied at the water tank and the train slowed up as it approached the crossing, and the train crew as well as disinterested witnesses say the speed at the crossing was from 10 to 12 miles per hour. The passengers did not know that an accident had occurred when the train

stopped after clearing the crossing. The emergency brakes were not applied. There was no sudden check of the speed. It is true that estimates of speed of a moving body are unreliable and will vary shockingly, except from experts. But the fact is that the highest estimate from plaintiff's witnesses is that the speed was about 20 miles per hour. We must not speculate, beyond the evidence, as to the speed, nor could the jury do so. At 20 miles per hour the train would go approximately 30 feet per second and in traversing 170 feet it would take over five seconds for the train to reach the crossing. But she says the train was not within 170 feet from the crossing when she looked while she was 43 feet from the crossing. The train was either going at a much higher rate than the evidence indicated, or she did not see it. There were other circumstances which would warrant the jury to infer that the speed of the train was greater than estimated. And the observations we have made based on calculations of distance and speed are of little practical value. They only serve to indicate that plaintiff did not look from a vantage point from which she could have seen the danger.

A railroad crossing proclaims danger in itself. Signs are put up at crossings to "look out for the locomotive." All persons know that swiftly moving trains are liable to pass over it at any minute. While the traveler may expect warnings of a train's approach to be given, he cannot rely upon that alone but must take reasonable precaution commensurate with the danger to protect himself. The obstruction of the store building for which defendant was not responsible, demanded of plaintiff that she should be careful to look for a train from that direction when looking would be effective. One glance interferred with by this obstruction which would limit her view for a distance of 170 feet would scarcely be a reasonable precaution when two or three feet further beyond the building would give a view extending from five hundred to seven hundred feet. She was not a stranger to the crossing and its dangers. An automobile may be driven within a few feet of a passing train without danger. It is quite different from horse drawn vehicles in that regard. It is easily stopped and controlled, when driven at a reasonable

rate of speed. The noise of its running lessens the hearing of other sounds of like character by the occupant of the car, and makes a correspondingly greater demand on the sense of sight. If vision is impaired or obstructed more careful exercise of the sense of hearing is demanded. The law requires the traveler both to look and listen, and under some conditions to stop, look and listen. If the senses of sight and hearing are obstructed, prudence and caution require the automobilist to stop and not take blind chances. Her car was closed and in operation. Possibly this accounted for her failure to hear the oncoming train, as others heard it. From the place she looked, the track was visible for a short distance. The evidence that she did not look we may discard because in conflict with her statement that she did look; but viewing the evidence as detailed by her and discarding the conflicting evidence, it is difficult to say that she used care and caution commensurate with the danger. 3 Elliott on Railroads (3rd Ed.) Sec. 1663; 22 R. C. L. page 1029; *Beyel* v. *Ry. Co.,* 34 W. Va. 538; *Berkeley* v. *Ry. Co.,* 43 W. Va. 11; *Riedel* v. *Trac. Co.,* 63 W. Va. 522; *Robinson* v. *Ry Co.,* 90 W. Va. 411; *Cavendish* v. *Ry. Co.,* 95 W. Va. 490; *Kline* v. *McAdoo,* 85 W. Va. 524; *Washington &c. Ry. Co.* v. *Zell,* 118 Va. 755; *Grand Trunk Ry. Co.* v. *Cobleigh,* 78 Fed. 784; *Denver &c.* v. *Cobb,* 164 Fed. 41; *Robertson* v. *Monongalia P. & Ry. Co.,* 99 W. Va. 356. Where the controlling facts are undisputed and are such that but one conclusion can be reasonably reached the question of contributory negligence becomes one of law for the court, and not one of fact for the jury.

The startling recurrence of crossing accidents between automobiles and trains resulting in the death of thousands each year, has brought about legislation in some States requiring a complete stoppage of the automobile before crossing. It is reflected in the recent decisions of the courts which, recognizing the tendency of recklessness on the part of many automobilists and increased danger to the lives of those on the trains from derailment and wreck by such accidents, require of the automobile driver a high degree of ordinary care.

A quotation from *Chase* v. *N. Y. Central Ry. Co.*, 208 Mass. 137, will illustrate the tendency of the recent decisions: "The driver of a horse drawn vehicle must look and listen in a reasonable way to secure his safety if possible, when approaching a crossing, but the driver of an automobile who is better able to settle an uncertainty on the side of safety, is rigidly held to reasonable care and precaution." See 22 R. C. L. page 1015; *New York Central & H. R. R. Co.* v. *Maidment,* 168 Fed. 21; 21 L. R. A. (N. S.) 794; *Robinson* v. *Oregon &c.*, 176 Pac. 594. These decisions, as well as many others that might be cited, and reason demand of an automobile driver when entering upon a railroad crossing to use a high degree of ordinary care and prudence; and we are in accord with this rule.

Plaintiff relies upon our cases of *City of Elkins* v. *Ry. Co.*, 76 W. Va. 733; *Casdorph* v. *Hines,* 89 W. Va. 448; *Bonar* v. *Ry. Co.*, 91 W. Va. 462; *Canterbury* v. *Director General,* 87 W. Va. 233, and cases from other States, to maintain the proposition that where the railroad company does not give warning, or is otherwise guilty of negligence, a traveler at the crossing may use ordinary care and if he looks and listens without ascertaining the approach of the train, he is not chargeable with contributory negligence if he enters the crossing and is injured. The *Casdorph* and *Bonar* cases have little application to the instant case. They were based largely upon the failure of the crossing watchman to perform his duty, and on whom they had the right to rely for warning of danger. In the *City of Elkins* case the view being obstructed by cars left by defendant standing on either side of the crossing leaving a space of about 20 feet for the crossing the team hitched to an empty wagon slowly approached the crossing, and both drivers looked and listened. When they crossed the first track and entered upon the crossing on the second track, an engine not discernable because of the long line of cars on the first track, suddenly and without warning struck and killed one of the horses. The court held it was not negligence *per se* for the drivers of the team not to stop, look and listen, and whether due precaution and ordinary care had been ob-

served was a jury question. In the instant case plaintiff could have seen the danger if she had looked at any time after she was within at least 40 feet of the track. The high degree of ordinary care, or as termed in the *Chase* case cited, the "rigidity" of the observance of the rule that an automobile driver must use reasonable care, required her to continue to look and listen. It is argued that she did not have more than three or four seconds in which to look, and she took that time in looking up the track. The length of time to look each way was lessened by the speed she maintained. *Askey* v. *C. B. & Q. R. R. Co.*, 162 N. W. 647. It was aptly said in the *Zell* case by the Virginia Court: "Drivers of automobiles are held to a higher degree of caution in crossing railroads at grade than drivers of wagons and other vehicles drawn by horses. If they cannot otherwise see or hear, they must stop, look and listen even in close proximity to the track, and if they fail to do so, and make chance, not stopping, their guaranty of safety, and are injured by moving trains, they cannot recover." In the *Canterbury* case the plaintiff looked and listened just before driving his team upon the crossing. There was no better vantage point from which he could do so; and there was positive evidence that no warning was given of the approach of the train moving at a rate of at least 45 miles per hour around a sharp curve.

In view of the strict and rigid application of the rule of care commensurate with the danger applied to drivers of automobiles in approaching railroad crossings, a rule founded on reason and modern experience, we have come to the conclusion that this case falls within the principles of the *Beyel, Cavendish, Robinson* and *Robertson* cases, cited, and presents a question of law, upon the facts as shown by plaintiff's evidence; and from those facts we conclude that the lower court did not err in setting aside the verdict. In this view of the case it would serve no useful purpose to discuss the points of error raised on the instructions.

The action of the Circuit Court in setting aside the verdict is affirmed.

*Affirmed.*