THE CHESAPEAKE AND OHIO RAILWAY COMPANY

*v.*

IRENE TABOR HARTWELL

*and*

IRENE HARTWELL

*v.*

THE CHESAPEAKE AND OHIO RAILWAY COMPANY

(No. 10818)

Submitted September 25, 1956. Decided December 11, 1956.

*Fitzpatrick, Marshall, Huddleston & Bolen, William C. Beatty,* for plaintiff in error.

*Spencer P. Simpson,* for defendant in error.

RILEY, JUDGE:

These two actions of trespass on the case were instituted in the Circuit Court of Kanawha County, and were consolidated by an order of that court.

In the first action The Chesapeake and Ohio Railway Company, a corporation, sought to recover $1,683.02 for property damage to one of its passenger trains, being designated in the record as a first-class train, in a collision between the train and an automobile owned and driven by the defendant, Irene Tabor Hartwell, which was stalled across the tracks of the railway company to the west of but near a public railway grade crossing in South Charleston, Kanawha County, on May 12, 1954.

In turn the defendant in the first action, in the abbreviated name of "Irene Hartwell", sought to recover in an action of trespass on the case against The Chesapeake and Ohio Railway Company, damages in the amount of $450.00 alleged to have been sustained by her automobile in the same collision.

Hereinafter The Chesapeake and Ohio Railway Company will be referred to as the "railway company", and the defendant, Irene Tabor Hartwell, as "Irene Hartwell".

In its declaration the railway company alleges that Irene Hartwell near midnight on May 12, 1954, negligently operated her automobile while attempting to cross the Rock Lake grade crossing, a public crossing in the City of South Charleston; and, further, that Irene Hartwell negligently drove her automobile completely off the public crossing, and on the railway company's tracks, the automobile coming to a stop astride the railway company's westbound main line, where it remained until it was struck by passenger train No. 5. It is alleged that the collision in which both the Hartwell automobile and the railway company train sustained extensive damages was proximately caused by the negligence of Irene Hartwell, without fault or negligence on the part of the railway company.

In Irene Hartwell's action she alleges in her declaration that the collision was the proximate result of the railway company's careless and negligent failure to keep a proper lookout and in operating the train at an excessive rate of speed.

After both actions had been matured in the Circuit Court of Kanawha County and had been consolidated by order of that court, a trial was had to a jury after the pleas of the general issue.

At the conclusion of the railway company's evidence, counsel for Irene Hartwell moved the court to strike the evidence, and direct a verdict for her as defendant. The

trial court overruled this motion, and she then introduced her evidence. After both parties had rested, Irene Hartwell again moved the court to strike the evidence of the railway company and direct a verdict for her as the defendant in the first action. The circuit court sustained this motion on the ground that the railway company had failed by its evidence to show negligence on the part of that defendant. To this action of the circuit court exception was made, and then the jury was directed in the action of The Chesapeake and Ohio Railway Company against Irene Tabor Hartwell to find for the defendant in that action.

A motion having been made by the railway company to strike the evidence of Irene Hartwell and direct a verdict for it, as defendant in the second action, was overruled and, accordingly, the case of Irene Hartwell against The Chesapeake and Ohio Railway Company was submitted to the jury, and the jury returned a verdict in favor of the plaintiff in that action against the railway company in the amount of $295.00.

After the jury in the case of The Chesapeake and Ohio Railway Company against Irene Tabor Hartwell was discharged from consideration of that case, and, after hearing the instructions of the court and the arguments of counsel, the jury retired in the case of Irene Hartwell against The Chesapeake and Ohio Railway Company, returned in open court, and found in favor of the plaintiff in that action, assessing her damages at $295.00.

Thereupon, the railway company, by its counsel, moved to set aside both verdicts and award it new trials. These motions having been overruled, to which action counsel for the railway company objected and excepted, the circuit court on October 10, 1955, entered judgment on both verdicts, which provided that the railway company take nothing in its action against Irene Hartwell; that Irene Hartwell recover her costs, including the statutory attorney's fee; and that Irene Hartwell in her action against the railway company recover from the defend-

ant the sum of $295.00, with interest and costs, including the statutory attorney's fee.

To both judgments The Chesapeake and Ohio Railway Company has prosecuted writs of error to this Court.

On the night of May 12, 1954, Irene Hartwell, the owner of a 1946 Plymouth four-door automobile, was returning from Boone County to her home on MacCorkle Avenue in South Charleston. She was accompanied by one Clyde Meadows, who rode in the front seat of the automobile, and also in the automobile were Georgia Pearce and a Mrs. Bailey as passengers. In returning from Boone County, a young man named J. D. Bayes, drove the car until it reached his home about two blocks east of Rock Lake crossing, where Bayes left the Hartwell automobile, and thereupon Irene Hartwell took over the operation of the car, driving the car west on the Kanawha and James River Turnpike in the City of South Charleston. At this portion of its course the turnpike runs in a generally east-west direction almost parallel with and to the south of the main line tracks of the railway company. After driving a short distance from the Bayes home, the car came to the railway company's grade crossing known as Rock Lake crossing. This crossing intersects the tracks of the railway company at about right angles in a north-south direction. As Irene Hartwell approached the grade crossing, she made a right turn from the turnpike, in order to proceed northerly across the tracks. However, instead of crossing the tracks of the railway company, the car was driven off the west side of the crossing, which, as this record discloses, is on the driver's left at the crossing, where her car was caused to come to a complete rest a short distance west of the crossing and across the rails of the railway company's westbound main line track. The Hartwell automobile when it came to a rest was so located that the radiator was pointed in a northwesterly direction, and the rear thereof was four to five feet, or more, to the west of the crossing itself.

In the appraisement of this case this Court is realistic enough to know that through trains cannot slow down, in the absence of an emergency, at every crossing, public or private. We say this because railroads are built for the purpose of operating trains thereon, and such trains are entitled to the free use of the tracks. 15 M. J., Railroads, Section 48; *Chesapeake and Ohio Railway Co.* v. *Craft* (W. Va.), 162 F. 2d 67.

Beyond peradventure this record discloses that at the crossing there were three tracks, the first on the south side parallel with the turnpike over which Irene Hartwell was approaching being the railway company's eastbound main line; the second the railway company's westbound main line; and the third a side track. The crossing was twenty-four feet wide on the eastbound and westbound main lines, and of sufficient width to permit the passage of two automobiles. The crossing was marked on both sides by standard cross buck signs. Nearby and on the north side of the crossing there was a street light, which was forty feet from the northern edge of the turnpike to the south, or first rail of the eastbound main line. The approach was inclined, rising some six feet two inches from the turnpike to the eastbound main line. As the crossing proceeds over the tracks, it is, as appears from photographs in this case filed in connection with Irene Hartwell's testimony as Exhibits Nos. 1, 2, 3, 4, and 5, nearly level as it crosses the tracks of the railway company. The side track and space in between the eastbound and westbound main lines were of black top construction, and that the crossing was smooth and in good condition appears from Irene Hartwell's photograph Exhibit No. 5, which was taken two days after the accident occurred.

The record fully establishes that the Rock Lake crossing was a public crossing. The distinction between a public crossing, such as we are considering in this record, and a private crossing, was fully discussed by this Court in the case of *Daugherty, Adm'r.* v. *The Baltimore and Ohio Railroad Co.,* 135 W. Va. 688, 64 S. E. 2d 231. But because the Hartwell automobile came to a stop on the

westbound main line of the railroad company off the crossing, this is not the usual railroad crossing case, which this Court has had under consideration in many cases, including the cases of *Darling* v. *The Baltimore and Ohio Railroad Co.*, 136 W. Va. 303, 69 S. E. 2d 139; *Gilkerson* v. *The Baltimore and Ohio Railroad Co.*, 132 W. Va. 133, 51 S. E. 2d 767; *Arrowood* v. *Norfolk & Western Railway Co.*, 127 W. Va. 310, 32 S. E. 2d 634; *Jackson* v. *The Chesapeake and Ohio Railway Co.*, 110 W. Va. 568, 159 S. E. 517; *Boggess* v. *Monongahela West Penn Public Service Co.*, 107 W. Va. 88, 147 S. E. 480; *Morris's Admx.* v. *The Baltimore and Ohio Railroad Co.*, 107 W. Va. 181, 147 S. E. 759; and *Krodel* v. *The Baltimore and Ohio Railroad Co.*, 99 W. Va. 374, 128 S. E. 824.

The portions of the crossing on the railway company's eastbound and westbound main lines were of solid timbers. Except for the fact that Irene Hartwell testified that she drove to the top of the crossing, where she suddenly lost control of her automobile; that it seemed to her like the automobile "bounced" and when it "bounced" the steering wheel "jerked", and when it jerked that caused the automobile to go upon the tracks, there is no evidence in this case tending to show that the crossing was defective in the sense that this Court held that the crossing was defective in the case of *Humphrey* v. *Virginian Railway Co.*, 132 W. Va. 250, 54 S. E. 2d 204; and except, further, that when she related that a man made the statement to her that "a board was loose", and when cautioned not to testify as to what someone had told her, she testified that "a board was loose."

As the Hartwell automobile entered upon and remained on the crossing, Irene Hartwell was an invitee, and at that point the railway company was bound only to use reasonable care not to collide with her automobile, and owed only the duty to give the signals provided by statute. Code, 1931, Chapter 31, Article 2, Section 8.

When we say that Irene Hartwell, as she proceeded over and remained on the crossing, was an invitee, we

do not mean there was an express invitation, but that she had a right to be where she was. The status of a person on the railroad company's tracks at a public crossing is succinctly stated in 44 Am. Jur., Railroads, Section 494, which reads: "A person on a railroad track at a public crossing is not a trespasser, but is rightfully there, and the railroad company owes him the duty of ordinary care not to injure him, regardless of whether he reached the crossing by traveling the highway or walking along the track. Furthermore, the duty owed to him is not affected by the fact that he may be on the crossing with the intent to proceed along the tracks. A person at a private crossing may be, as to the railroad company, a licensee so that in the absence of any wilful or wanton conduct the company will not be liable for death or injury when he is struck by a train."

If, by reason of the physical makeup of the crossing itself, the Hartwell automobile was caused without any fault on Irene Hartwell's part to swerve to the left and travel along the tracks to the west of the crossing, she then and there became an involuntary trespasser, and, as such, retained her original status.

If, however, after Irene Hartwell had turned to the right on the crossing, and was proceeding thereover, she by her negligence or ineptness in the operation of the automobile drove the car to the left and on the tracks, she then and there became a trespasser, in which event the railway company would not be liable in the action of Hartwell against the railway company, in the absence of a wilful or wanton act on its part. 15 M. J., Railroads, Section 47; *Atlantic Coast Line R. Co.* v. *Gates*, 186 Va. 195, 42 S. E. 2d 283; *Ross* v. *Kanawha & Michigan R. Co.*, 76 W. Va. 197, 85 S. E. 180. And, by the same token, she would be guilty of negligence in driving her automobile to the perilous and inextricable position on the tracks, such as would bar her recovery in the case of Hartwell against the railway company, even if in the first instance the railway company had been guilty of primary

negligence. *Spain* v. *St. Louis & S. F. R. Co.* (Mo. App.), 190 S. W. 358, 360.

Accepting the foregoing as a norm upon which this Court will decide this case, let us at this point review the facts as portrayed by this record.

At the time Irene Hartwell took over the control of her automobile, after the Bayes boy left the car at his home about two blocks from the crossing and proceeded to drive her automobile along the turnpike in the direction of the crossing, and then, driving her car to the right in a northerly direction, entered upon the crossing, she was driving on a learner's permit. Mrs. Hartwell testified that she had failed to pass the driver's license test given by the state police, because of her inability properly to operate a motor vehicle.

There is nothing in this record from which the jury could have reasonably found that Irene Hartwell's status changed from that of an invitee to an involuntary trespasser, except for her testimony that the automobile "bounced" and "when it bounced" the "steering wheel jerked and when it did that it went off onto the tracks", and the unsupported testimony that there was a loose board. The evidence in these consolidated cases seems to preponderate to the effect that she became a voluntary trespasser by reason of her own negligence or her inept driving, which caused her automobile, after it had crossed the eastbound main line, to turn to the left on the crossing, and on and across the westbound main line. Neither Irene Hartwell nor her witnesses offer any explanation why the Hartwell automobile was caused to be driven off the crossing, and certainly if the Hartwell automobile had not been stalled off the crossing across the railway company's main line westbound track, the collision would not have occurred.

We have searched this record in vain to find any substantial evidence of contributory negligence on the part of the railway company in the case of The Chesapeake and Ohio Railway Company against Hartwell, so as to

justify a directed verdict in defendant's favor in that case; and, by the same token, there is no substantial evidence of primary negligence on the part of the railway company in the case of Irene Hartwell against the railway company. The record affirmatively shows, without contradiction, that from eight to fifteen minutes after the automobile became stalled, the whistle of the oncoming diesel locomotive with its attendant train was heard to the east of the crossing.

The railway company's witness, Edward Watts, who lived about fifty yards from the tracks, testified that he was sitting in his living room at the time, and heard the Hartwell car striking the railway company's rails, as it left the crossing; that he immediately went to the crossing, where he found the automobile completely off the western edge of the crossing; that he was familiar with the crossing, testifying that he noticed no defects therein; and that when he arrived at the scene of the collision Irene Hartwell asked him to back the car off the tracks. About the same time Robert Paul Slusser, a witness for Irene Hartwell, arrived at the scene; and, an unsuccessful effort having been made to remove the Hartwell automobile from the tracks, Watts and Slusser proceeded to the Watts home to call for a wrecker. Mrs. Watts, the wife of Edward Watts, had the wrecking company on the telephone when the train whistle was heard, and the witness Slusser testified that he then and there realized that he should have first called the railway company, in order to have the train stopped. Watts testified that he went about one hundred feet east of the crossing, and north of the tracks, where he attempted to flag the train, but was too close at the time he saw the train for his effort to be effective. Robert Slusser testified that he reached a point about three hundred yards east of the crossing, and that he did not have a flashlight, or any kind of light with which to flag the train. At first he said he was not on the track upon which the train was approaching, but later got on the track and remained there until the train was about three hundred feet away;

that he then ran off the tracks because he was afraid the train was going to jump the tracks, and he "****** was trying to get out of there." This witness was dressed in dark clothing, and because of the curve immediately east of the crossing, he did not see the train hit the Hartwell automobile, and did not know what happened when the train passed, because he was running away from the tracks.

The railway company's train, first-class passenger train No. 5, westbound from Hinton, West Virginia, in the direction of Huntington, and thence to Cincinnati, Ohio, consisted of a diesel locomotive and five baggage and passenger cars.

This record discloses no evidence of any city ordinance or any speed limit imposed by the railway company.

There were six public crossings east of Rock Lake crossing, at which the collision occurred, and crossing warning whistle signals had been given continuously for about two miles, while the train was approaching from the east. As the train came into the vicinity of the Rock Lake crossing, there was a right hand curve which favored the engineer. The headlight on the train was burning, and the uncontradicted evidence is that on a straight piece of track the beam of this type of light would make a man discernible up to about three hundred feet. However, the light went on a tangent to the left of the track, or south of the westbound track, because of the curve just east of the crossing, so that the crossing itself could not be seen until the locomotive was between seventy-five and a hundred feet east of the crossing.

Both the engineer and fireman testified that the speed of the train was about sixty-five miles an hour. The witness, Edward Watts, estimated the train was going about seventy miles an hour; and Clyde Meadows, a witness for Mrs. Hartwell, testified that the train was travelling "pretty fast", but that he did not know how fast. The witness for defendant, Robert Slusser, was unable to testify concerning the speed of the train; but Mrs.

Hartwell expressed the opinion that the train was "going more than seventy" miles an hour. The fireman on the locomotive, who was on the side on which Slusser was attempting to flag the train, testified that as the train approached the crossing, he saw nothing which would indicate that there was an obstacle on the westbound track, until he saw a man on the south side of the track, five or six car lengths, or two to three hundred feet east of the crossing, waving his hands, which person had on dark clothing and had no light, so that he did not see this person, evidently the witness Slusser, until the locomotive was about opposite this "volunteer" flagman; that he immediately informed the engineer, who promptly, in fact almost instantly, put the brake valve into an emergency position, which caused the brakes to go into emergency about two hundred feet from the crossing. The fireman's testimony is substantiated by the railway company's engineer, who was on the right side of the engine looking straight ahead. The train came to a stop with its rear car about a quarter of a mile from the crossing; the front of the locomotive was about three hundred and fifty feet farther from the crossing; and the uncontradicted testimony of all the railway company's witnesses was to the effect that this stop was the best possible in the circumstances.

The engineer, F. M. Guinn, a man of forty-seven years' experience as a railroad engineer, testified that a train of the type and size involved in the collision, travelling sixty-five miles an hour, would travel some two thousand feet, or better, before coming to a dead stop. The fireman testified that a stop at sixteen to eighteen hundred feet would be a good stop, and testified, "Well, we thought we made an excellent stop."

Both the engineer and fireman testified that they did not see anything on the crossing or on the tracks west thereof until they were about one hundred to one hundred fifty feet from the crossing, just around the curve, and when the light on the locomotive began to swing on the crossing, they observed the Hartwell automobile across

the westbound track; and the brakes of the locomotive having theretofore been put into a hard emergency, the engine crew had done all that was possible to avoid a collision.

This last-mentioned testimony is without contradiction, and the testimony of the members of the train crew that hard application of the air had been applied so as to lock the wheels, is substantiated by the fact that after the train had stopped, an inspection revealed that several of the wheels on the passenger coaches had been flattened from sliding along the rails, as a result of the emergency application of the air.

After the collision the train proceeded toward St. Albans, but was stopped for further inspection because of "bumpiness", resulting from the damaged wheels; and thereupon a telephone report was made to St. Albans, where the train was ordered to stop for survey by the car inspectors and the train master. At St. Albans a slow order was issued, and the crew was instructed not to exceed thirty-five miles an hour in going to Huntington, where the train finally arrived nearly two hours late because of the collision. The damaged engine and coaches were taken out of service and placed in the railway company's shops at Huntington.

The evidence bearing on damages offered by the railway company and on behalf of Irene Hartwell is clear and uncontradicted.

The railway company established the cost of repairs necessitated to its engine and coaches and overtime payments made on salaries to the trainmen at a total of $1,683.02. On the other hand, Irene Hartwell in her declaration alleges damages of $450.00 for the almost complete destruction of her automobile, and the jury returned a verdict in her action against the railway company of $295.00.

This case in the final analysis lends itself only to a consideration of what was the proximate cause of the

collision between the railway company's train and the Hartwell automobile. A careful examination of this record discloses to this Court the fact that if the Hartwell automobile had not been driven off the crossing at a place where it could not be extricated before the arrival of the train, the collision would not have occurred. In fact, this case does not involve the question of primary and contributory negligence, but is simply a case of proximate cause. The last efficient negligent act which caused the collision was the fact that the Hartwell automobile was in a position where it could not be extricated and where the train crew, even by the exercise of due care, could not have averted the collision. Therefore, we arrive at the inescapable conclusion that the last efficient proximate cause of the collision was the negligence of Irene Hartwell in driving her automobile off the crossing on the main lines of the railroad company. *Webb, Admr., etc.* v. *Sessler, et al.*, 135 W. Va. 341, pt. 2 syl., 63 S. E. 2d 65.

With this conclusion in mind we have no other course than to reverse the judgment of the Circuit Court of Kanawha County in directing a verdict in favor of the defendant in the case of the railway company against Irene Tabor Hartwell, and in permitting the jury to decide the case of Irene Hartwell against the railway company.

For this reason this Court reverses both judgments upon which the instant writs of error have been granted, sets aside the verdicts in both cases, and grants new trials.

*Judgments reversed;*
*verdicts set aside;*
*new trials awarded.*