## CHARLESTON.

NORA CAVENDISH, ADMX. ETC., *v.* CHESAPEAKE & OHIO RY. CO.

Submitted January, 29, 1924.     Decided February 5, 1924.

1. EVIDENCE—*Observation of Facts by One Class of Witnesses Not Inconsistent with Failure of Another Class to Observe It.*

    The fact that witnesses have heard signals given by a locomotive approaching a crossing warning travelers of danger, is not necessarily in conflict with the evidence of other witnesses who did not hear them; for the observation of the fact by those who heard is consistent with the failure of the others to hear them.    (p. 495).

2. SAME—*Whether Conflict Between Positive and Negative Evidence in Hearing Warning Signals Depends on Particular Case.*

    Whether a conflict arises between positive and negative evidence of this character depends upon the facts and circumstances of each case from which it may be determined whether such negative evidence has any probative value.    (p. 495).

3. RAILROADS—*Traveler Required to Look and Listen.*

    It is the duty of a traveler approaching a railroad crossing under the circumstances of this case, to look and listen for approaching trains before entering upon the crossing and placing himself in a situation of danger.    (p. 500).

4.　SAME—*Traveler's Caution Should be Commensurate with Danger.*

If the view be obstructed rendering the crossing more dangerous the traveler should use caution commensurate with the increased danger.　(p. 500).

5.　SAME—*Traveler Held Negligent.*

Where eye-witnesses to a railway crossing accident fatal to the traveler all agree that he entered upon the crossing without either stopping, looking or listening, and it appears that by the ordinary use of these senses the approaching train would have been seen or heard and the accident avoided; and it further appears that he was warned to "look out" before he reached a place of danger; the question of contributory negligence on his part is not for the jury, and the court should direct a verdict for defendant, although the speed of the train in approaching the crossing was so great as to render passage thereover more dangerous.　(p. 503).

6.　SAME—*Traveler's Negligence Held Proximate Cause of Injury.*

In such case the proximate cause of the injury is the negligence of the traveler.　(p. 501).

Error to Circuit Court, Fayette County.

Action by Nora Cavendish, administratrix of John M. Cavendish, deceased, against the Chesapeake & Ohio Railway Company.　Judgment for plaintiff, and defendant brings error.

*Reversed; verdict set aside; remanded.*

*Fitzpatrick, Brown & Davis,* and *C. W. Strickling,* for plaintiff in error.

*Hubard & Bacon,* for defendant in error.

LIVELY, JUDGE:

John M. Cavendish was accidentally killed on a railroad crossing in the city of Montgomery, by westbound Chesapeake & Ohio train No. 1, about 10:30 o'clock on the morning of November 3, 1921.　On the 13th day of February, 1923, plaintiff, as administratrix of his estate, obtained a verdict and judgment for $5,000 against the railroad company, for negli-

gently causing his death; and this writ of error was awarded to that judgment.

The accident occurred on the Lee Street crossing where there are three tracks of the railroad company, of standard gauge, about eight feet apart. The westbound track, where the accident occurred, lies north and parallel with the other two tracks, the one next to it is known as the eastbound track on which the trains going east run, and the other track is known as the house or spur track, and is used for the accommodation of business houses located near it, and for switching purposes. Just south of this spur track, running parallel with and adjoining it is Gaines street, a paved street running east and west. On the north side of these tracks and adjoining the railroad right of way is Front street, which also runs east and west. Lee street crosses these tracks at almost right angles, and is one of the principal streets leading from the part of the town south of the railroad tracks across the same to the Kanawha River bridge, and is extensively used by pedestrians, wagons and motor vehicles. West of the Lee street crossing six hundred and ten feet is the passenger depot, where all passenger trains stop. One hundred and twenty feet east of the Lee street crossing the tracks begin a slight curve (1 degree and 32 minutes) to the southeast. At the time of the accident box cars were parked on the spur track both east and west of the crossing. There were five or six east of the crossing, one of which was within a few feet of the crossing on the eastern side thereof, and the contents thereof were being loaded into a truck by Walton and Stockton, who were witnesses. Cavendish was seventy-two years old, without impairment of sight or hearing and active for his age, and was engaged in a grocery business which was conducted by his daughter. He made deliveries to the customers and hauled groceries and goods from the wholesale houses to the grocery store, and had done so for about nine months, and was familiar with all of the crossings and the times and movements of the regular trains on the railroad. He was driving a one-horse wagon and came down Gaines street parallel with the spur track a short distance therefrom, turned onto the crossing at the spur track where Walton and Stockton

were unloading the contents of the car there standing, and started over the crossing of the three tracks. Westbound C. & O. train No. 1 was coming in from the east over the westbound track, and they met on the crossing of that track, the horse getting almost across. The wagon was demolished and Cavendish caught on the pilot of the engine and carried about one hundred yards west, receiving serious injuries from which he very soon thereafter died. The horse was crippled, his hind legs broken, and he was killed by some one a short while after the accident.

A statement of the location of the streets, crossings, tracks, signal posts, distances, obstructions and general situation would be greatly aided if the map could be incorporated in this opinion. It will be observed that the box cars standing on the spur track immediately east of the Lee street crossing obstructed the view of the tracks to the east from any one entering upon the crossing. However, after the spur track was crosed there was nothing to obstruct the view east along the tracks for about two hundred yards to a coal tipple which would partially obstruct the view from that point. There was some evidence that a switching engine was somewhere to the east, but whether on the eastbound track or spur track is very indefinite, and its location was somewhere near the tipple. It was a bright clear autumn day and quite a number of people had gathered near the station expecting the incoming train then about due, and others were near the scene of the accident in pursuit of business or pleasure. Two or three of these witnesses give a rather clear narrative of the accident, and there is very little, if any, controversy of fact.

The negligence charged to defendant in the declaration is: (1) that no station or crossing signals were given of the approach of the train; (2) that the speed of the train was in excess of fifteen miles per hour, and in violation of an ordinance of the city; and (3) that the box cars were placed near the crossing on the spur track also in violation of an ordinance of the city.

Defendant says it was not guilty of any negligence; and further defends upon the ground that Cavendish, without any care, deliberately drove his horse in front of the engine,

or attempted to "beat it across" the westbound track; and was clearly guilty of contributory negligence. In proving the ordinances regulating the speed of trains and the parking of cars within forty feet of a crossing, plaintiff introduced the then recorder who testified that such ordinances were on the minutes or ordinance book of the municipality and that he had found them and made copies thereof, which copies, not certified, were tendered by him as true copies, and allowed to go to the jury. Neither the original ordinances nor the ordinance book containing them were tendered. One or two members of the city council testified that ordinances regulating the speed and parking had theretofore been adopted. The recorder who testified was not such at the time of the passage of the ordinances, but was inducted into office a considerable time subsequent to their passage. Defendant objected to the introduction of these ordinances by this method and contends that these ordinances, if any there existed, were not propérty proven.

The principal act of negligence relied upon by plaintiff is the failure to give proper signals of the approach of the train as required by section 61, chap. 54, Code, and it may be conceded that the failure to do so would constitute negligence. Much of the evidence is upon this contention. Defendant asserts that there is no real conflict in the evidence on this point. All of plaintiff's witnesses who were examined touching the giving of signals, say they did not hear any given, except Burgess, who testified that he was standing at his open window and had a view of the approach of trains for a good distance east of the place of the tragedy, and he heard the station signal given, one long blast, before the train came in sight. Upon observing the train come in sight around the slight curve and near the coal tipple, he turned and went back to his desk in another part of the office, and did not hear any further signal given for the crossing. He did not see the collision. Upon hearing the station signal he looked to see what train it was, and then turned to his desk. His evidence as to the crossing signal was negative. None of plaintiff's witnesses say no signals were given. When asked if she heard any crossing signals given Lillian Montgomery replied: "I don't recall that I did." Walton was asked, "Do

you know whether any signal was given for the crossing?'' and, answered, ''No, sir.'' Stockton, in reply to a similar question, said, ''If there was any I didn't hear it.'' To the same effect is the evidence of Cotter, Davin, Curry, Brinton, and Turner. Some say signals might have been given, but that they did not hear any and were not listening for signals. On the other hand, the engineer, fireman and baggageman say that not only the station signal, one long blast, was given when they entered the east end of the city, but that the regular crossing signals, two long and two short blasts, were given at the whistle post east of the crossing. The baggage master says he was listening for these signals by which he was apprised of the nearness of the station at which he was to unload baggage, and upon hearing them he accordingly moved his baggage nearer the door to be unloaded. Black, a witness for defendant, who conducted an insurance business in the city and had no interest in the suit, was waiting for the train near the place of accident in order to meet his employer whom he expected on the train, and says he not only heard the station signal but also the signals for the crossing. These four witnesses are positive. Witness Montgomery, who saw the accident, and who testified for defendant, said he did not hear signals given. The engineer and fireman both say that not only the whistle signals were given, but that when the train first entered the city on the east the engine bell was started ringing by compressed air (a button pushed for that purpose) but was kept ringing, and continued to ring for a minute or two after the train stopped and Cavendish was removed from the pilot; then at the direction of the engineer the fireman climbed onto the locomotive and stopped its ringing. No witness contradicts them as to the ringing of the bell. The most that can be said is that plaintiff's witnesses heard no signals given.

Is there a substantial conflict? If there be, the question is for jury determination. Where a witness says a signal was not given, that he was listening for it for some reason and did not hear it, his testimony is entitled to as much credence as one who says it was given. Thus in *Carnefix,* v. *Railroad Co.,* 73 W. Va. 534, some workmen said the signal was not given because they usually assembled and went to

work when that particular train blew for the crossing where the accident occurred; that they remarked among themselves at the time that no signal was given. They were listening for the signal. And in *Canterbury* v. *Railroad,* 87 W. Va. 233, two witnesses said they had just passed the place where the whistle board was located and the train then passing did not give the usual signal, a fact which they had commented upon to each other before they heard of the accident. The positive evidence of a single witness is entitled to more weight than that of many equally credible who testify negatively. A familiar illustration is where one of several in a room says he heard the clock strike the hour, while the others testify that they did not hear it strike. But in applying this rule much depends upon the circumstances of each particular case, such as the opportunity of the witnesses for knowing the fact and the attention which they were giving to the matter. The fact that Burgess heard the station signal, and that Black heard both the station and crossing signals, and that the fireman and engineer say both signals were given, heard by the baggage man who was listening for them in order to perform his duties is not necessarily in conflict with those who heard no signals, for the observation of the fact by the former class of witnesses is entirely consistent with the failure of the latter class to hear. Negative testimony is always admissible and it must be considered with other facts and circumstances and in some instances may be of equal or superior weight to positive testimony. In *Bahringer* v. *Campbell,* 137 N. Y. Supp. 241, the action was to recover for death in an automobile accident, and there was evidence that the person driving the car had sounded the horn as the car approached the decedent; others who were nearby and had witnessed the accident and could have heard the horn said they did not hear it sounded. The circumstances were such that the negative evidence was held to be in conflict with the positive evidence. Illustrative of the rule under discussion is *Hoffard, Admr.* v. *I. C. Railroad,* 16 L. R. A. (N. S.) 797, where it was held that a conflict in evidence requiring jury determination is not created where there is positive evidence that a signal for a crossing has been given and evidence from witnesses in a closed house one-half mile away that they did not hear it.

The rule stated by Wigmore in Vol. 1, sec. 664 of his work on evidence, is that the existence of a fact may be negatived by what may be called negative knowledge founded on the witness' failure to see or hear a fact when he would supposedly have heard or seen, if it had occurred; the only requirement being that the witness should have been so situated that in the ordinary course of events, he would have heard or seen the fact if it had occurred. Lawson, in Vol. 3, sec. 1184, on Rights and Remedies, says: ''Where the evidence is conflicting as to whether the bell was rung or the whistle sounded at a crossing, and there is affirmative testimony that this duty was performed and negative testimony by other witnesses that they did not hear it, the affirmative evidence of the fact should overcome the negative. That plaintiff did not hear the signal is no evidence that it was not given.'' The courts should be careful not to deprive the jury of considering such negative testimony where the surrounding facts will accord thereto some probative value; and it is a familiar practice to allow a witness, after he has described the circumstances, to state that he would or would not have heard the signal if it had been given. *Murray* v. *St. L. Transit Co.*, 176 Mo. 183, 75 S. W. 611. The witnesses for plaintiff do not say they would have heard the station or crossing signals if they had been given. They were not impressed with the fact that none were given. We think their evidence is purely negative and of very little weight in comparison with the positive evidence, especially of those who had no interest in the litigation by employment or otherwise. Whether the jury based its finding upon failure to give proper signals is hard to determine. Whether the speed and parking ordinances were determining factors in bringing about the verdict is also impossible to determine. In our view we do not think it is material to inquire. We do not think the ordinances were authenticated by the best method. But irrespective of the ordinances, defendant by leaving its box cars on the spur track on both sides of the Lee Street crossing in close proximity thereto, obstructed the view of those approaching the crossing from the south side of the town who had occasion to use that crossing, creating a situation of greater danger to them. The crossing was in the heart of the town and was extensively

used, no watchman was there, and no automatic warning device. Having placed these box cars there, thus creating more danger to those travellers approaching the crossing from the south, a greater degree of care was incumbent on defendant in operating its trains. The evidence is conflicting as to the speed of the train, the witnesses varying in their estimates from eighteen to thirty-five miles per hour. The fact that the train after striking the wagon ran below Ferry street before stopping about one hundred feet, in all about one hundred yards, with the emergency brake on one hundred feet or more before the impact, impels the conclusion that the speed was greater than prudent, in the heart of the town where this dangerous condition had been created. All of the witnesses, except those in charge of the locomotive, many of whom from their every day notice of the movements of trains say the speed was very rapid. At common law a railroad must exercise ordinary care to prevent collision with travellers on the highway; the care must be proportioned to the danger; and where the surroundings are such as to render the crossing peculiarly dangerous it is the duty of the company to exercise care commensurate with the danger especially where the company has created the added danger. *Atlantic Coast Line* v. *Grubbs,* 113 Va. 214, 78 S. E. 144; *New York, etc. Ry. Co.* v. *Ravdel,* 47 N. J. L. 144; 23 Am. & E. Ry. Cases 308; *Weaver* v. *Columbus, etc. Ry.,* 76 Ohio St. 164; 81 N. E. 180. More precaution is required at a crossing in a city, than in the country where the chances of accidents are less. The jury may have concluded, and the evidence would justify it in finding that although crossing signals were given, defendant negligently operated the train in respect to its speed and did not approach the crossing with due care in view of the dangerous situation created by it. Of course Cavendish had a right to rely to a limited extent upon defendant to exercise due care, but he could not rely upon it to such an extent as to dispense with ordinary care on his part. This brings us to the crux of the case.

Was Cavendish guilty of contributory negligence? If so, there could be no recovery. As before stated, there is very little conflict in the evidence as to how the accident occurred, and how and in what manner Cavendish approached the cross-

ing of the westbound track. There were several eye witnesses. The only confusion in the testimony is in relation to how far the view was unobstructed to the east after he had passed between the box cars standing on the spur track. It is reasonably clear from both the testimony of witnesses for plaintiff and defendant that the view was clear and unobstructed for at least three hundred feet to the east after he had cleared the box cars on the siding. Plaintiff's witness Davin, a druggist, who was expecting some one on the train and who saw the accident, and who observed the movements of Cavendish after he came through the cut of box cars, says there was a clear view up the track to the east for at least three hundred feet. There is no controversy over the fact that Cavendish, both before and after he entered the crossing, did not stop, look or listen, but continued in a slow walk until it was apparent that he observed the approaching train and then attempted to cross the westbound track by hurrying his horse. Some of the eye witnesses say he began urging his horse while he was on the eastbound track, and others think he had entered the westbound track before he began to strike his horse in order to hurry across. It was a clear day, and Cavendish knew the time of the running of the train which was coming in on time, and was in possession of unimpaired sight and hearing. All of the witnesses who saw the accident either heard or saw the train coming near the coal tipple about six hundred feet from the crossing. In fact, Stockton, who had finished unloading the contents of the box car into his truck, and who was standing at the entrance of the crossing on the spur track and in the act of cranking his car when Cavendish drove past him, distinctly heard the train approaching and as Cavendish's wagon was passing between the box cars over the spur track crossing he warned him to "look out". Cavendish looked up and gave no heed to the warning but drove on. He said that after Cavendish's wagon passed the spur track he began to whip his horse, and he then turned to call to his companion Walton, and did not see the accident. Walton also heard the train coming at the time Cavendish passed by the truck, but never noticed him after he passed, because "I presumed he would stop" as he seemed "awful careful". Witness Davin says he saw Cavendish enter the crossing be-

tween the box cars travelling very slowly until he had started over the eastbound track or somewhere between the eastbound and inside rail of the westbound tracks when he began to whip his horse. Witness Allen says that when Cavendish entered the crossing the train was about opposite the tipple and that Cavendish was on the westbound track when he began to whip his horse. Black, a witness for the defendant, and who was engaged in the piano department of a furniture company at Montgomery, witnessed the accident, and saw Cavendish when he entered the crossing and the train approaching, and says Cavendish made no halt, was sitting straight up in the wagon with the reins in his hand, and as he approached the westbound track he raised his reins and about that time the acci dent occurred. The remaining eye witness was Carl Montgomery, a druggist living in the city, who was in an automobile and stopped his car about two hundred feet west of the crossing when he saw the train coming and Cavendish approaching the westbound track from between the box cars. He said he stopped because he "sensed" that an accident would happen. His testimony is that Cavendish approached the westbound crossing slowly and was entering the westbound track when he looked up and saw the train approaching as he judged one hundred and fifty feet away when he began to whip his horse and to urge him across the track.

In the absence of evidence to the contrary, the presumption would be that Cavendish stopped, looked and listened, and that he used ordinary precaution in entering upon a dangerous crossing. *Young* v. *Railroad,* 44 W. Va. 221, 33 Cyc. 1072. Here we have positive evidence that Cavendish did neither of these things. Apparently he used no caution whatever. It is true the cars standing on the spur track prevented his seeing the approach of the train until after they had been passed. But this fact does not excuse him from looking, listening and stopping after he had passed the spur track. Where the crossing is hazardous the traveller must use more than usual caution in entering upon it. The presence of the railroad tracks is in itself a warning of danger. A rule based on reason is that the vigilance of the traveller must be in proportion to the danger, and as the danger increases he must be more vigilant to employ his faculties and senses to avoid

it.    Beach on Contributory Negligence, (3d Ed.) sec. 196, p. 289.    And where the track is obstructed by cars or otherwise, interfering with sight or hearing, extra caution should be observed.    3 Am. & Eng. Ann. Cas. 700.    This case clearly falls within the principles announced in our cases of *Beyel* v. *Newport News Ry. Co.*, 34 W. Va. 538; *Bassford, Admr.* v. *Ry. Co.*, 70 W. Va. 280; *Cline* v. *McAdoo, Director*, 85 W. Va. 524 and *Robinson* v. *Ry. Co.*, 90 W. Va. 411.    Plaintiff relies upon our cases of *City of Elkins* v. *Ry. Co.*, 76 W. Va. 733; *Canterbury* v. *Director Gen.*, 87 W. Va. 233; *Carnefix* v. *Railroad Co.*, 73 W. Va. 534; *Bonar* v. *Ry. Co.*, 91 W. Va. 462; and *Casdorph* v. *Hines, Director Gen.*, 89 W. Va. 448.    In the *Casdorph* and *Bonar* cases there were watchmen at the crossings upon whom the injured travellers had a right to rely for notice of the approaching trains, and therefore the duty upon them to stop, look and listen was not so great, where by the action of the watchmen they could presume that it was safe to enter upon the crossings.    In the *City of Elkins* case the view was obstructed, but there was evidence that the drivers of the team which was destroyed in the collision did actually stop, look and listen before entering upon the crossing; and in the *Canterbury* case the person injured testified that when he got to the embankment just before entering the crossing he extended his head out of the buggy beyond the side curtains which protected him from the rain on that side, and looked up the track and also listened for a train approaching from that direction and that he had a view of the track to where it began to curve sharply and entered a deep cut; that he listened for signals and none were given.    In the *Carnefix* case there were physical facts which contradicted the evidence of the fireman, and from which the jury could presume that the deceased had exercised proper precaution before attempting to enter the crossing.    These cases are easily distinguished from the present case.    We think the undisputed evidence clearly shows that Cavendish was guilty of contributory negligence; that it was not a question for the jury but one of law for the court, and that the peremptory instruction to find for the defendant should have been given.

In view of the box car obstruction and the speed at which

.the .train was approaching the crossing, from which the jury might have .concluded that the defendant was negligent, .we have carefully considered the evidence concerning the action of decedent in entering upon and attempting to pass over this dangerous crossing, to see if there could be any evidence, fact or circumstance on which we could say that the question of contributory negligence on his part would be for the jury and not for the court we have .failed to find any, and under the well settled law we must set aside the verdict and judgment and remand the case for a new trial.

  · *Judgment reversed; .verdict set aside; case remanded.*