## KILMER et al. v. NORFOLK & W. RY. CO. *
### No. 2961.

Circuit Court of Appeals, Fourth Circuit.
Nov. 17, 1930.

*Certiorari denied 51 S. Ct. ——, 75 L. Ed. ——.

Harry H. Byrer, of Martinsburg, W. Va. (E. L. Luttrell, W. C. Kilmer, and Kilmer & Byrer, all of Martinsburg, W. Va., on the brief), for appellants.

L. I. Rice, of Martinsburg, W. Va., and Forrest A. Brown, of Charles Town, W. Va. (F. M. Rivinus, of Philadelphia, Pa., and Brown & Brown and Forrest W. Brown, all of Charles Town, W. Va., Emmert & Rice and Howard H. Emmert, all of Martinsburg, W. Va., on the brief), for appellee.

Before NORTHCOTT, Circuit Judge, and McCLINTIC and HAYES, District Judges.

McCLINTIC, District Judge.

Lucille Kilmer instituted an action at law in the circuit court of Jefferson county, W. Va., against the Norfolk & Western Railway Company, and James P. Morison, an infant, suing by his next friend, also instituted an action at law in this same court against the same defendant. These actions were properly removed to the District Court of the United States for the Northern District of West Virginia for trial. For reasons which will appear in the statement of facts, the two cases were consolidated for trial before one jury. When all the evidence was introduced, upon motion of the defendant the court directed a verdict for it in each action. This direction of verdicts and the refusal to set them aside when so returned are assigned as error by the plaintiff in each case.

The actions were based upon injuries received by each of the plaintiffs when the automobile in which they were riding was struck by a train of the defendant as the automobile was passing over its main track at a public crossing, locally known as Morgan's Grove Crossing in Jefferson county, W. Va.

The plaintiff Lucille Kilmer, about twenty-eight years of age, and the plaintiff James P. Morison, about eighteen years of age, on the 14th day of December, 1928, soon after 4 o'clock in the afternoon, left the home of the father of James P. Morison, Dr. G. P. Morison, in an automobile owned by the plaintiff Morison, for the purpose of going to the town of Shepherdstown, a distance of about 1½ miles, to buy some meat for supper. Plaintiff Kilmer, for a period of eight years prior to this day, had made her home with the Morisons. She had been employed by Dr. Morison as an assistant in his office, but such employment had ceased about a month before the accident. She intended to shortly leave to take a course of training in a city hospital. The Morisons had lived in this home for a period of almost three years. Each plaintiff was thoroughly familiar with the railway crossing in question, and also each one was familiar with the fact that there was a passenger train north bound due to pass over that crossing shortly after 4 o'clock in the afternoon. It is proven that the leaving time of this train at Shenandoah Junction was seven minutes after 4 o'clock, and the leaving time at Shepherdstown was nineteen minutes after 4 o'clock, and that the distance between these two places was 6³⁄₁₀ miles, and that this crossing was on this stretch of defendant's railway, and about 1½ miles from Shepherdstown. Plaintiff Kilmer accompanied plaintiff Morison for the purpose of selecting the cuts of meat, for the reason that Mrs. G. P. Morison was not satisfied with the selections theretofore made by him.

It was raining and foggy. The plaintiffs testify that the fog was very dense, and that, when they approached the crossing, it was impossible to see more than 60 feet. The distance from the home of Dr. Morison to the crossing was about 1,000 feet. At the crossing there was a one-end side track, and the switch therefor was about 400 feet south. The plaintiffs were riding in a new car with four doors, and both of them were sitting on the front seat. Morison was driving. The plaintiffs testified that, when the automobile approached the crossing, it was stopped at a distance of a few feet from the side track, and that the front window at the driver's left was opened, and that the plaintiffs looked and listened, and, seeing and hearing no signs or signals of any approaching train, closed the window, and, putting the car into low gear, started across the railway tracks; that, on account of the dense fog, the line of vision was very limited, each placing the distance at about 60 feet; that, when the automobile was on the main track, Morison happened to look up south, and the train was not more than 20 feet away, and he tried to get across, ahead of the train, but failed. The rear end of the automobile was struck, and the plain-

tiffs were thrown out and badly hurt, and the car was very much damaged. The distance from the bumper, where plaintiffs testified the car was stopped, to the center of the main line of the railway at the crossing, was about 24 feet, and to the same point from where the plaintiffs were sitting in the car was 33 feet. The train of the defendant was a fast passenger one, consisting of an engine and five cars running at a rate of 55 miles per hour, and was six or seven minutes behind its schedule time. There was no scheduled stop between the stations of Shenandoah Junction and Shepherdstown. The road at this crossing was traveled only by a few persons. There was a loading platform facing the side track, and variously testified to be 3 to 5 feet high and 14 feet long, immediately south of the road as it was traveled by the plaintiffs in approaching the crossing and on the side from which the train came. The engineer of the train testified that, when the engine was about 180 feet away, he saw the top of the automobile over the platform approaching the crossing, and that he then gave the distress signal by three short blasts of the engine whistle. It was testified by the plaintiffs that their car was stopped in the rear of this platform, and that it proceeded then onto the crossing from that point. The crossing, as shown by the photographs thereof, was smooth and practically level across the side track and main line. The tracks were only slightly elevated above the level of the road on either side. The south whistling post was 944 feet from the center of the crossing on the main track. There was testimony tending to show that on a clear day, at the point where plaintiffs testified the car was brought to a standstill, a vision of 800 feet could be had of the railway track in the direction from which the train was coming. From the testimony of the witnesses of the plaintiffs, it is reasonable to find that it took a space of time of sixteen seconds for the automobile to start from the point where it had stopped to start again and go upon the main track where it was struck by the train. The windows were all closed from the time that the plaintiffs started until the stop before reaching the side track, when the front one on the left side was lowered for a few seconds. Then it was closed, and the plaintiffs drove on the track with all the windows dimmed by fog and mist.

In order to show negligence upon the part of the defendant, the plaintiffs, in their respective declarations, charge: First, that the defendant failed in its statutory duty to have the bell or whistle on the locomotive rung or blown at a distance of at least 60 rods from the place where the railroad track crosses any public highway, and further failed to keep the bell ringing or whistle blowing for a time sufficient to give due notice of the approach of such train before such highway was reached; second, that the defendant recklessly and negligently drove its locomotive and passenger train at a dangerously high rate of speed over and upon the crossing, and did not keep a proper lookout for the safety of travelers on the highway, and especially the plaintiffs.

The defendant, on its part, denied the allegations of negligence made by the plaintiffs, and claimed that the plaintiffs, by their own negligence in driving upon the crossing in the way and manner shown by the evidence, contributed in a material way to their injuries.

Was there any substantial evidence produced to prove negligence by the defendant as charged?

Were the signals required by statute of the employees of defendant on an engine approaching a crossing given in the way and manner required by such statute?

Seven witnesses, four of whom were not employees of the defendant, testified positively that the whistle was sounded at the proper time and place, and in the proper way, as required by law, for this crossing. Three witnesses testified that each heard the whistle on the engine sounded, but were uncertain as to the exact place where it was so sounded. Only the plaintiffs failed to hear it, and they gave the negative testimony that, if it had been sounded, they would have heard it. One of the employees on the engine testified positively that he rang the bell thereon by hand from a point south of the whistling post to and by the crossing. The plaintiffs also testify that they did not hear it, and think that each of them would have heard it if it had been rung—again, wholly negative testimony. The plaintiffs were in a closed automobile, with the windows all closed, except for the few seconds when it was stopped. The engine in the machine was at least making some noise, and attention was being given to driving. The train was traveling about 80 feet each second. According to plaintiffs' witnesses, it took sixteen seconds to start the automobile and reach the point on the track where it was struck. During this time it was running in low gear, and during this time the train ran 1,300 feet, practically one-

quarter of a mile. When they stopped, lowered the window of the automobile, looked and listened, as testified by plaintiffs, the train was 1,300 feet away, 350 feet beyond or south of the whistling post, and, when plaintiffs closed the windows and started their car, the time had not arrived and the place had not been reached for the ringing of the bell or blowing of the whistle. It took the train sixteen seconds then to reach the crossing, and, according to the plaintiffs' evidence, it took the automobile, from the time it started, sixteen seconds to reach the crossing; hence the inevitable collision. Even if it had been a clear day instead of a rainy, misty, foggy one, the train would have been out of the vision of plaintiffs at the time and place where they testified they stopped, looked, and listened, as one could only see 1,800 feet south on the track at that point. The automobile, being wholly closed and running in low gear, necessarily made considerable noise. Then, under the testimony, it further appeared that it was raining briskly, which necessarily added to the other noises and rendered it very unlikely that the plaintiffs (the occupants of the car) would or could hear the whistle blown or bell rung, and it is quite reasonable to believe that they did not hear them. They did hear the distress signals when the train was very close and the danger very imminent.

Under all the evidence and the conditions shown to be existing at the time, to us there is no difficulty in arriving at the certain conclusion that the statutory signals for this crossing were given on the day of the accident.

In Cavendish v. C. & O. Railway Co., 95 W. Va. 490, 121 S. E. 498, it was held that:

"The fact that witnesses have heard signals given by a locomotive approaching a crossing, warning travelers of danger, is not necessarily in conflict with the evidence of other witnesses who did not hear them; for the observation of the fact by those who heard is consistent with the failure of the others to hear them."

In the same case, the court further said:

" * * * Illustrative of the rule under discussion is Hoffard, Adm'r, v. I. C. Railroad, 138 Iowa, 543, 110 N. W. 446, 16 L. R. A. (N. S.) 797, where it was held that a conflict in evidence requiring jury determination is not created where there is positive evidence that a signal for a crossing has been given, and evidence from witnesses in a closed house one-half mile away that they did not hear

it. The rule stated by Wigmore, in volume 1, § 664 of his work on Evidence, is that the existence of a fact may be negatived by what may be called negative knowledge founded on the witness' failure to see or hear a fact when he would supposedly have heard or seen, if it had occurred; the only requirement being that the witness should have been so situated that in the ordinary course of events he would have heard or seen the fact if it had occurred. Lawson, in volume 3, § 1184, on Rights and Remedies, says: 'Where the evidence is conflicting as to whether the bell was rung or the whistle sounded at a crossing, and there is affirmative testimony that this duty was performed and negative testimony by other witnesses that they did not hear it, the affirmative evidence of the fact should overcome the negative. That plaintiff did not hear the signal is no evidence that it was not given.' "

The second charge of negligence was based upon the alleged failure of the employees of the defendant to keep a proper lookout, and that the speed of the train was excessive. There is no evidence to support the first of these charges. The only evidence upon the subject was that of the engineer, who testified that he was looking ahead and giving strict attention to his duty in that respect. In respect to the speed of the train, it must be remembered that this was a sparsely settled community, and that this highway was but little traveled. It was a side road, as that term is used along modern highways. The railway undoubtedly has a right to regulate the speed of its trains, consistent with the safety thereof, over little used crossings where there is no congestion of traffic and no speed limit fixed by law. The schedule of time of this train on the day of the accident, leaving Shenandoah Junction, was seven minutes past 4 o'clock in the afternoon, and leaving Shepherdstown was only twelve minutes later. This distance is 6⁹⁄₁₀ miles. This schedule, including starting at Shenandoah Junction and stopping and starting at Shepherdstown, would require an average speed of 46²⁄₁₀ feet per second. When the time of stopping and starting is eliminated, it will be seen that the time of 80 feet per second at the point of the accident is but little, if any, greater than the regular running time of this train.

We are of opinion, upon the facts proven and the necessary inferences therefrom, that there was and is no actionable negligence shown upon the part of the defendant under this charge. Baltimore & O. R. Co. v. Reeves

(C. C. A.) 10 F.(2d) 329; Pennsylvania R. Co. v. Stegaman (C. C. A.) 22 F.(2d) 69.

When the learned trial judge directed the verdicts for the defendant, he evidently not only considered the failure of the plaintiffs to prove their charges of negligence against the defendant, but he also considered the question of contributory negligence, as shown by the evidence relative to the acts of the plaintiffs before and when the accident occurred. On this question, a distinction is claimed between plaintiff Morison, owner and driver of the automobile, and plaintiff Kilmer, claimed to be a passenger therein. Therefore, on this phase we will consider the cases separately in some respects and jointly in others.

The plaintiffs were each well acquainted with the roads and railway crossing, and, further, with the fact that a fast passenger train on the line of the defendant ran north shortly after the hour of 4 o'clock in the afternoon. It was a misty, rainy, and foggy day in winter. Plaintiff Kilmer had been a member of the Morison family at their country home for nearly three years, and had been an employee and close friend for five years more. She was an experienced nurse and business woman, twenty-eight years of age. Plaintiff Morison was a school boy of eighteen years of age, and had grown up with plaintiff Kilmer, and to some extent, at least, under her tutelage and control. They left the Morison home on the day of the accident on a common and joint mission for the family. The young brother of plaintiff Morison was very ill. Each was much concerned about him. They sat together on the front seat of the tightly closed car as they went forth on this family mission. The short distance, for an automobile, of 1,000 feet, brought them to the railway crossing in fourteen seconds, according to the testimony of Dr. Morison. What happened then? It is unnecessary to again recite the testimony of plaintiffs. Suffice it to say that they stopped too far away and looked and listened where such action on their part was of little or no value.

In the case of Robertson v. Power & Railway Company, 99 W. Va. 356, 128 S. E. 829 (decided in 1925), the court held:

"1. In addition to the duty to look and listen in both directions, one approaching a railroad crossing must stop where the circumstances of the case require it.

"2. A railroad crossing is of itself a proclamation of danger, and a traveler about to cross the track must always exercise care proportionate to the danger; as the danger increases more vigilance is required.

"3. The duty to look and listen before entering upon a railroad crossing requires the traveler to exercise care to select a position from which an effective observation can be made.

"4. One driving an automobile towards a railroad crossing which he can see but where his view of the track on either side is obscured, must have his car under such control that he can stop before reaching a zone of danger in case a train is approaching; and if he fails without reasonable excuse to observe such precaution, he is guilty of negligence."

We quote from the opinion in the same case the following authorities:

"In 3 Elliott on Railroads (3d Ed.) § 1661, it is said: 'The duty to look and listen requires the traveler to exercise care to select a position from which an effective observation can be had. The mere fact of looking and listening is not always a full observance of the duty incumbent upon the traveler, for he must exercise care to make the act of looking and listening reasonably effective, and must usually continue to be on the lookout and exercise his faculties until he has crossed.' See, also, 22 R. C. L. 1030; Babbitt on Automobiles (3d Ed.) § 1847; Huddy on Automobiles (7th Ed.) § 674; Washington & O. D. R. Co. v. Zell, 118 Va. 755, 88 S. E. 309; Askey v. C., B. & Q. R. Co., 101 Neb. 266, 162 N. W. 647. In the case last cited it is said:

"'It is the duty of a traveler on a highway, when approaching a railroad crossing, to look and listen for the approach of trains. He must look, where, by looking, he could see, and listen, where, by listening, he could hear; and if he fails without reasonable excuse to exercise such precautions he is guilty of negligence.'

"And in Wehe v. A., T. & S. F. R. Co., 97 Kan. 794, 156 P. 742, L. R. A. 1916E, 455, it was held: 'The driver of an automobile cannot recover damages for injury to himself and his machine, where he approaches a railway track at a place at which he can not see along the track until his automobile is in a place where he will be struck by a passing engine or cars, and does not stop his car to ascertain whether or not there is danger, although he listens before going into the place of danger and does not hear any engine or cars coming.'

"To the same effect see Sanford v. Grand

Trunk Western R. Co., 190 Mich. 390, 157 N. W. 38; N. Y. Cent. R. Co. v. Maidment, 168 F. 21, 93 C. C. A. 413, 21 L. R. A. (N. S.) 794; Glick v. Railway Co., 124 Md. 308, 92 A. 778; Babbitt on Automobiles (3d Ed.) § 1849. In the Federal case just cited, it was said: 'The duty of an automobile driver approaching tracks where there is restricted vision to stop, look, and listen, and to do so at a time and place * * * where listening will be effective, is a positive duty, and these safeguarding steps the plaintiff failed to take. He stopped where stopping would serve no purpose, and failed to stop where stopping would have disclosed danger. He made chance, and not sight, the guaranty of his safety.'"

. In the case of Washington, etc., Ry. Co. v. Zell, 118 Va. 755, 88 S. E. 309, the court said:

"Drivers of automobiles are held to a higher degree of caution in crossing railroads at grade than drivers of wagons and other vehicles drawn by horses. If they cannot otherwise see or hear, they must stop, look and listen even in close proximity to the track, and if they fail to do so, and make chance, not stopping, their guaranty of safety, and are injured by moving trains, they cannot recover."

This statement of the law is quoted with approval by the Supreme Court of West Virginia in the case of Krodel v. Railroad Co., 99 W. Va. 374, 128 S. E. 824.

A mass of cases decided by the highest court in West Virginia support the defense of contributory negligence as found by us in these actions. Some of them are as follows: Beyel v. Railroad Co., 34 W. Va. 538, 12 S. E. 532; Berkeley v. Railroad Co., 43 W. Va. 11, 26 S. E. 349; Robinson v. Railroad Co., 90 W. Va. 411, 110 S. E. 870; Jameson v. Railroad Co., 97 W. Va. 119, 124 S. E. 491.

A number of cases from the Federal Reports do likewise. Some of them are as follows:

Chicago, R. I. & P. R. Co. v. Houston, 95 U. S. 697, 24 L. Ed. 542; Schofield v. Railroad Company, 114 U. S. 615, 5 S. Ct. 1125, 29 L. Ed. 224; Dernberger v. Railroad Company (C. C. A.) 243 F. 21; and Id. (D. C.) 234 F. 405. Neininger v. Cowan et al. (C. C. A.) 101 F. 787; Elliott v. Railroad Company, 150 U. S. 245, 14 S. Ct. 85, 37 L. Ed. 1068.

We desire to especially call attention to the case of Baltimore & Ohio Railroad Company v. Goodman, 275 U. S. 66, 48 S. Ct. 24, 72 L. Ed. 167, 56 A. L. R. 645. In this case, the train was running at the rate of 60 miles an hour, the driver's view was obstructed by a building, and he drove upon the track at the rate of 5 or 6 miles an hour without looking or listening before going on the track, and the Supreme Court held that he was guilty of contributory negligence as a matter of law. If Goodman had looked from a point close to the track, he would have seen the train and avoided the accident. If the plaintiffs in this case had looked and listened at a point close to the main track, they would have seen or heard the train, or both, and avoided the accident. They could not look effectively from that point farther away because of the fog any more than Goodman could from such point on account of the building. The syllabus of this case is very applicable here. It is as follows:

"One who drives upon a railroad track relying upon not having heard a train or any signal and taking no further precaution, does so at his own risk. If he can not otherwise be sure whether a train is dangerously near, the driver must stop and get out of his vehicle before attempting to cross.

"In an action for negligence the question of due care is not left to the jury when resolved by a clear standard of conduct which should be laid down by the courts."

Under the facts as admitted or proven in this action, we are of opinion that the driver of the automobile, plaintiff Morison, was plainly guilty in law of contributing to his own hurt by his own acts of negligence, and cannot recover any damages against the defendant in this action.

In view of our conclusion that the accident was caused solely by the negligence of the driver Morison, and that there was no negligence on the part of the defendant company, it is not necessary to discuss the question whether the plaintiff Kilmer was guilty of contributory negligence.

The conclusions hereinbefore set out necessarily require the affirmance of the judgments rendered in these two actions.

Affirmed.

HAYES, District Judge (dissenting). ·

The evidence as to negligence and contributory negligence is sufficient to create a question for the determination of the jury. It is not the duty of this court to determine the preponderance of the evidence. If such were the case, it would be easier to concur in

the result. Since a verdict was directed in favor of the defendant, we must consider the evidence and all reasonable inferences to be deducted therefrom in the light most favorable to plaintiffs. This principle is too well established to require citation of authority.

The plaintiffs were injured at a public railroad crossing, and the negligence, if any, consists in failing to give due notice of the approach of its train by timely signals, as required by the law of West Virginia. The statute requires the whistle blown or bell rung at least 60 rods from the crossing and kept whistling or ringing until due notice of the approaching train is given at the crossing. Code of West Virginia, chapter 54, § 61. This duty is not discharged by giving a signal 60 rods from the crossing. The signal must be continued for such a time and in such a way as will give due notice to persons at the crossing of the approach of the train. Failure to discharge this duty is negligence, and, if it is a proximate cause of the injury, is actionable. Manifestly the kind of signal and its duration necessary to satisfy the statute will vary according to different circumstances, but in every instance it must be of such kind and quality as will give due notice of the approach of the train. Thus two questions of fact arise—the signal and its sufficiency. The evidence in favor of the plaintiffs is at least quasi negative, although it rises to the dignity of positive evidence according to many decisions. The weight of such evidence becomes strong or weak in proportion to the opportunity of the witness to accurately observe, the attention he was paying, and the likelihood of his hearing the signal if it had been given. Perhaps the outstanding Circuit Court decision which sustains this view is Chesapeake & O. Ry. Co. v. Steele, 84 F. 93, 95. The opinion is written by Judge Lurton, and Judge Taft was a member of the court. The facts in that case are strikingly similar to the facts in this case, except in that case there were ten witnesses who testified positively the signals were given against a much smaller number who did not hear them. Quoting from Judge Lurton's opinion:

"It has been most earnestly argued that the evidence tending to prove negligence in respect to the giving on this occasion of the usual and customary crossing signal was not such as required the submission of that question to the jury. If we confine our attention to the mere question as to whether any crossing signal was given, it must be admitted that the decided weight of proof was that such a

signal was given. If, however, the evidence tending to show a neglect of such precaution amounted to something more than a mere scintilla, it was properly submitted to the jury. * * *

"Even upon this aspect of the question of negligence, it cannot be safely said that there was not some substantial evidence tending to show that no warning was given other than the alarm sounded when the deceased were in the act of crossing. * * * Still it is not possible to say that where two witnesses have equal opportunities, and gave equal attention to their surroundings, the denial by one of an occurrence testified to by the other does not make a conflict of evidence."

Again: "But the negligence of the railroad company may as well consist in the insufficiency of a signal in respect to timeliness as in a failure to give any."

This decision has never been overruled and has been cited with approval many times: Illinois Central Railroad Co. v. Jones (C. C. A.) 95 F. 370, 373; Baltimore & O. Railroad Co. v. Baldwin (C. C. A.) 144 F. 53, 55; Chicago & E. I. Ry. Co. v. Divine (C. C. A.) 39 F.(2d) 537, 538.

A recovery was sustained in the last case on facts similar to the instant case and writ of certiorari denied. 281 U. S. 765, 50 S. Ct. 464, 74 L. Ed. 1173.

The Supreme Court passed on the question in Northern Pacific Railroad v. Freeman, 174 U. S. 379–381, 19 S. Ct. 763, 764, 43 L. Ed. 1014, in which Mr. Justice Brown, speaking for the court, says:

"There was testimony from several witnesses in the neighborhood tending to show that no whistle was blown by the engineer as the train approached the crossing. There was also the testimony of the conductor, engineer, and fireman that the whistle was blown. As the majority of plaintiffs' witnesses were so located that they would probably have heard the whistle if it had blown, there was a conflict of testimony with respect to defendant's negligence, which was properly left to the jury."

The view is in harmony with text-writers.

"The broad rule that positive testimony is of greater weight than negative does not go so far as to render the latter necessarily inefficient in case of the former, and it should never come in conflict with the general rule that the weight of the testimony should be left to the jury. * * * Where positive testimony that signals were given is met by testimony in direct denial by witnesses who

could well have heard them if they had been given, it is generally held that the latter testimony is positive in character equally with the former, so that in a jury case the court is not at liberty to determine the issue by granting a nonsuit or directing a verdict." Jones, Commentaries on Evidence, vol. 1, p. 37, where numerous authorities are cited.

"Courts have often been asked to exclude testimony based on what may be called negative knowledge, i. e. testimony that a fact did not occur, founded on the witness' failure to hear or see a fact which he would supposedly have heard or seen if it had occurred. But there is no inherent weakness in this kind of knowledge. It rests on the same data of the senses. It may even sometimes be stronger than affirmative impression. The only requirement is that the witness should have been so situated that in the ordinary course of events he would have heard or seen the fact had it occurred.

"Nevertheless, from some source not traceable, there lingers in the judicial mind, in many quarters, an antiquated notion that negative impressions are not so probative as affirmative impressions. * * * Modern psychology sneers at the law's crude assumption that the complexities of human perception can be handled by some rules of thumb about negative testimony or the like." Wigmore on Evidence, vol. 1, pp. 1068–1071. To the same effect is 10 R. C. L. p. 1011.

Cavendish v. Chesapeake & O. Ry. Co., 95 W. Va. 490, 121 S. E. 498, 502, is not in conflict, but upholds the principle. While the deceased was held guilty of contributory negligence, the reason is stated as follows:

"It is reasonably clear from both the testimony of witnesses for plaintiff and defendant that the view was clear and unobstructed for at least 300 feet to the east after he had cleared the box cars on the siding. * * * There is no controversy over the fact that Cavendish both before and after he entered the crossing, did not stop, look, or listen."

He was warned to look out. The crux of that case was contributory negligence. While it discusses the law generally as to the rules of positive and negative evidence, the decision does not rest on that point.

Assuming, however, that what is said is not dictum, the opinion states:

"Where a witness says a signal was not given, that he was listening for it for some reason, and did not hear it, his testimony is entitled to as much credence as one who says it was given."

It then cites with approval cases where negative evidence was sufficient for the jury's determination, namely, Carnefix v. Railroad Co., 73 W. Va. 534, 82 S. E. 219; and Canterbury v. Railroad, 87 W. Va. 233, 104 S. E. 597.

The accident occurred December 14, 1928, at 4:24 p. m., according to the engineer, and the sun set at 4:46. It was drizzling rain and foggy—some witnesses said the fog was so dense you could not see farther than 60 feet, some 150 feet, some 100 yards—and there was no headlight on the engine. The track traverses a valley at the scene of accident. "The sky was heavily overcast—somewhat dark—getting late in the afternoon," as testified by Dr. Glover. The train, running north toward Morgans Grove crossing at 55 miles per hour and a few minutes late, was coasting, except about ten pounds of steam to prevent the cylinders knocking—the most noiseless way it could operate. The evidence as to where the whistle blew is exceedingly conflicting even among witnesses for defendant. Some witnesses named fixed objects south of the crossing along the railroad. The civil engineer of defendant made certain measurements. The distances to the following places are from the Morgans Grove crossing where the accident occurred. It is 445 feet to a point on the railroad track parallel with the south building on the fair grounds. C. Johnson, a witness for defendant, and a passenger on the train, said the train was at that point when it first blew for the crossing, but he admits that he was not paying much attention. It was 946.6 feet to the whistle post. Wm. Butler's residence is 900 feet from the railroad track and 1,120 feet from the whistle post. He said he heard the whistle blow two longs and two shorts at or near the whistle post at exactly 4:25 p. m. The track is back of his house. He was sitting in the front room, and did not see the train, and did not hear of the accident until the next day. If we accord to him superhuman power of concentration on immaterial things and an infallible memory, and concede that he heard, observed, and impressed on his mind the four blasts of the whistle, then noted and remembered the exact position of the hands on the clock dial, 4:25, it is yet still a guess on his part as to the position of the train when the whistle blew and its continuation necessary to give due notice of the approach of the train at the crossing. It is 1,752.6 feet to the Billmeyer private crossing. Settles, defendant's fireman and witness, says the train was south of this crossing when the whistle was blown. "Q. Then

it is your idea that the whistle was blown— this regular whistle, blown just about the Billmeyer crossing isn't it? A. Well it was along—maybe a little south of the crossing." It is 1,900 feet to a point in the track directly in the rear of the Billmeyer barn. The barn is 361 feet from the track. Adrian Billmeyer, a disinterested and unbiased witness who was at the barn milking, said the train was back of his barn when the whistle blew, and he would swear positively it was south of his private crossing. Dorrough, the engineer, denied blowing the whistle there. He said he began blowing it 100 or 150 yards south of the whistle post, and estimates he consumed ten seconds giving the signals. If his estimate is correct, the whistling ceased 596 feet south of the Morgans Grove crossing and 151 feet before he got to the shed at the fair grounds where C. Johnson said the whistle blew the first time. Johnson was a passenger and not an employee of defendant. Wiseman, the brakeman, said the crossing whistle signal was blown something like 300 feet away from it.

The two remaining witnesses for the defendant, one of whom was its employee, who testified that the signals were given, were at that time in Shepherdstown, which is one mile north of Morgans Grove crossing. While it is conceded that they could hear the whistle, it is manifest that it is impossible from that position to locate, by sound alone, with any degree of accuracy, the position of the train when the whistle was blown. From the defendant's evidence the jury might well reach either one of three conclusions as to the place of blowing the whistle, namely, south of Billmeyer crossing over 1,750 feet from accident crossing; at or near the whistle post, 946 feet from it; or at the south end of the fair grounds, 445 feet from it. But the blowing at the first or the last place would not satisfy the statute. If it is conceded that the whistle was blown at either one of the places, we are left in a state of grave doubt whether it was continued for a sufficient length of time to give persons at the crossing due notice of the approach of the train. Thus of the defendant's seven witnesses—four of whom are its employees— the evidence as to timeliness of signals is so conflicting as to create a jury question.

In addition to the evidence of Billmeyer, Dr. Morison, Dr. Glover, and the plaintiffs testified. Dr. Morison, father of plaintiff Morison, heard the whistle blow away up the track, at least a half mile. He was on a hill above the railroad and 900 feet from the crossing. It was a half mile from his position to the back of Billmeyer's barn where Billmeyer said it blew. Knowing his son was approaching the crossing, and feeling some apprehension, he walked 88 feet to a point where he caught the dim outline of his son's car near the crossing, saw it stop near the track, and then go out of his sight in the fog. Instantly distress signals were given by the whistle, and he heard the crash. He heard no whistle between that one-half mile up the track and the distress signals, and no bell ringing. By an actual test of his movements, 30 seconds elapsed from the blast of the whistle until the accident, and during this time the train ran 2,400 feet. Yet he was in an excellent position to hear, his attention was directed to the movements of the train and his boy, and it is highly probable that he would have heard either if it had been given. Dr. Glover, who had just crossed the track, and was 150 yards from the crossing, stopped his car to light a cigar. He heard the whistle blow a half mile up the track. (It was just a half mile from where he was to Billmeyer's barn.) He said it was so foggy at the crossing that he could not see farther up the track than 150 feet, he had felt uneasy, and, his attention being thus attracted, he listened, after hearing the whistle a half mile up the track, to see if it blew for the crossing, and he did not hear it. His car window was open, he was in a position to hear, and he was listening. Certainly he would have heard it if it had been blowing from 150 yards south of the whistle post to within 596 feet of the crossing.

The plaintiffs stopped the car within 15 feet of the side track, or 21½ feet from the reach of a passing locomotive on the main line. There was nothing except fog and rain to obstruct sound or sight between this point and the approaching train. The opportunities for seeing or hearing the train were as favorable there as elsewhere. From this point on a clear day the train would be in plain view 775 feet, and the little platform in no way obstructed the view. Defendant's witness, Lowe, so testified. Morison stopped the car, rolled the window down, and he and Miss Kilmer looked and listened for the train. They neither saw nor heard a sound of it. Miss Kilmer said: "From the time we started on the track until we were struck, I was looking up and down the railroad, looking for the train, I had nothing else to do except that." Later plaintiff Morison demonstrated the place where he stopped, lowered the window, put it up, enmeshed the gears, and drove on the track—all of which con-

sumed 14 seconds. If 14 seconds were used to stop the car, lower the window, look and listen for the train, roll it up again, and drive on the main track, what would have hindered plaintiffs from hearing the signals if they were given as the engineer says. In that 14 seconds the train ran 1,120 feet. When the car stopped, the train was 632 feet north of Billmeyer's crossing. Billmeyer and Settles said it blew south of that crossing. Miss Kilmer thought they stopped a half a minute, and it is all mere estimate as to time. The engineer claims to have commenced blowing from 1,096 feet to 1,396 feet of the crossing. We cannot assume the signals would not have been heard, if given. For what purpose did they stop, if not to assure themselves that no train was approaching? Why was Miss Kilmer looking up and down the railroad for the trains, if she was not making use of her senses to ascertain if danger was near? It is true that she does not say that she was also listening up and down the track. Is it probable that she could have been vigilant to look, as she testifies, without listening also? Since she was not sure a train was not approaching and looking all the time to be certain, it is far more than likely she was listening too. Both plaintiffs saw the train before the distress signal was given, which is strong evidence of their keeping a lookout. They also heard the distress whistle after seeing the train. Now they estimate the train was 15 or 20 feet from them, but in such a perilous moment we should recognize that they had little opportunity to measure distance when destruction seemed so imminent. The engineer said he was keeping a constant lookout, and first got a glimpse of the car coming out from the platform when he was about 180 feet from the crossing; that he then grabbed the whistle and blew it immediately in the hope that the car would either stop or get on across. He said he was so close it would not have slacked the speed of the train by applying the emergency brake before reaching the crossing, but he brought the train to a complete stop a little over 400 feet of the crossing by using the emergency after the accident. Moreover, the engineer, who first said he grabbed the whistle after he got the first glimpse of the car, on cross-examination said he had his hand on the whistle when he discovered the car. He said the automobile was running at a very rapid rate of speed. Both plaintiffs said it was in low gear from the time they started across the track until it was hit, and it was making 5 or 6 miles per hour; that a foot and a half would have put it in the clear.

It is true the fireman said he rang the bell all the way from the whistle post to the crossing, but it was not heard by another witness. It is doubtful whether such a signal, in view of the speed of the train, could have given due notice to persons at the crossing of the train's approach. Plaintiffs said if the whistle had blown or bell rung within 1,000 feet they would have heard it. They indirectly say they were listening. We are urged to disregard this because they were closed up in the car and could not hear on account of the rain and noise of the car. Every witness said it was just drizzling rain, except plaintiff Morison, who said it began to rain hard. There is no evidence that it rained so hard that the noise of it interfered in the least with the ability of the occupants to hear. Both plaintiffs said they could see about as well with the windows closed as open. Morison said the car was a new Chrysler with a very soft motor. There is no evidence to the contrary. Regardless of the plaintiffs frequently looking for the train, both saw it as quick as the engineer saw them, for they saw the train before the whistle blew and he blew as soon as he could discover the automobile. The fireman said the collision occurred an instant after the distress signal was given.

We are not warranted upon the evidence in concluding that the signals were given or continued as required by the law. We cannot assume that the plaintiffs could not hear the signals, if given. It would be mere conjecture—the evidence does not warrant it. The evidence tends to show a failure to give the requisite signals as prescribed by the statute and declared by the decisions of the Supreme Court of that state. Kelley v. K. & M. Ry. Co., 99 W. Va. 568, 130 S. E. 677; Coleman v. Railway Co., 100 W. Va. 679, 131 S. E. 563; Carnefix v. R. R. Co., 73 W. Va. 534, 82 S. E. 219; Charleston & W. C. R. Co. v. Alwang, 258 F. 297 (C. C. A. 4th.)

The evidence is plenary to show such failure was a proximate cause of the injury. We cannot safely say in the light of all the evidence the accident would have happened if the requisite signals had been given. The evidence does not justify it.

Again it is urged that the plaintiffs are clearly guilty of contributory negligence and the verdict should have been directed for this reason on the authority of B. & O. Ry. Co. v. Goodman, 275 U. S. 66, 48 S. Ct. 24, 72 L. Ed. 167, 56 A. L. R. 645; Robertson v. Power & Ry. Co., 99 W. Va. 356, 128 S. E. 829; Krodel v. Railroad Co., 99 W. Va. 374, 128 S. E. 824. But the facts in this case do not

bring it under either case. It is conceded that a traveler must look from a point where looking is effective and listen likewise, and, if he can neither see nor hear, he must stop; if he fails, he crosses at his peril. This is not new law. It was declared by the Supreme Court in Northern Pacific Railroad Co. v. Freeman, 174 U. S. 379, 19 S. Ct. 763, 43 L. Ed. 1014. In each case where the rule has been applied the evidence conclusively established that the accident would not have occurred if either caution had been reasonably observed. There was a failure to stop, or a failure to listen, or a failure to look when by doing so no injury would have resulted. The view was obstructed by buildings or embankments or box cars. There was an entire absence of care on the part of the injured. No such rule has been applied where the sight was prevented or impaired by darkness or fog. Here we are asked to put this case in a class with broad daylight crossing accidents. No similar case has been cited, and I found none which is authority for so holding.

In this case plaintiffs did stop, look, and listen in less than 22 feet of the swing of the train; by estimation it stopped 14 seconds before the impact. Within that 14 seconds Morison rolled his window down and they looked and listened for the train without seeing or hearing a sound of it. He said he put the window up, but Miss Kilmer said she did not believe it was put up. He then started across the track in low gear. The inference is irresistible that he was cautiously approaching the track, keeping his eyes on it except where it was necessary to have his eyes on the operation of the car. He could not see for the fog more than 60 feet; Dr. Glover estimated it 150 feet, and the engineer estimated it 180 feet. As the train was making 80 feet a second, it is very uncertain from this evidence whether it was humanly possible to observe it in time to avoid the accident. To say the least, a jury of twelve men instead of one judge should decide it under the rule of the prudent man. Plaintiffs had a right to expect defendant to give a signal at a place 60 rods from the crossing and keep it up until due notice of the approach of the train was given at the crossing. They had no reason to assume that defendant would run its train through the dense fog and gathering darkness without a headlight and without the whistle blowing or the bell ringing and at an unusual speed of 55 miles per hour. Having stopped where they did and looked and listened under the circumstances appearing in the record, it is unrea-

sonable to hold as a matter of law that they are guilty of contributory negligence for not stopping again at the track. C. & O. Ry. Co. v. Waid, 25 F.(2d) 366, 367, (C. C. A. 4th). The opinion in this case states:

"He might have seen the approaching cars if he had looked a second time in the direction from which they were coming before going upon the track. But we think that he should not be held guilty of contributory negligence as a matter of law because he did not look twice in the same direction within 6 seconds. The engine to his left demanded a share of his attention. The crossing itself demanded a share. Under such circumstances, is he to be held guilty of negligence as a matter of law because of his failure to see a danger which, if his evidence be believed, he looked for once only 6 seconds before he was struck, and failed to see because of defendant's negligent failure to display the lights and give the signals which every traveler along the highway had a right to expect? We think not."

The instant case belongs in the class of cases of Morris' Adm'x v. B. & O. Ry. Co., 107 W. Va. 97, 147 S. E. 547; Morris v. B. & O. Ry. Co., 107 W. Va. 181, 147 S. E. 759; Norfolk & Western Ry. Co. v. Holbrook (C. C. A.) 27 F.(2d) 326; Perucca v. B. & O. R. Co. (C. C. A.) 35 F.(2d) 113; Chicago & E. I. Ry. Co. v. Divine (C. C. A.) 39 F.(2d) 537, 538, certiorari denied, 281 U. S. 765, 50 S. Ct. 464, 74 L. Ed. 1173.

In the last case and the Morris Cases the parties did not stop to look. The Morris Cases review the decisions of West Virginia, and the principles there stated warrant the court in the instant case to submit all the issues to the jury.

It is conceded that the railroad track is a proclamation of danger; that the traveler must stop for the train and not the train for the traveler, but it is no proclamation that a train will coast noiselessly along it at the rate of 55 miles per hour in a dense fog as darkness gathered and without a headlight and without signals. As plaintiffs were unaware of these increased dangers caused by the negligence of defendant, if the evidence is believed, and they stopped, looked, and listened and continued to watch for the train, it is a question for the jury and not for the court to say whether the conduct of the plaintiffs reaches the standard of the reasonably prudent man.

Miss Kilmer went with Morison to select some steak; she had no interest in it or control over the car or driver; there was no

joint enterprise or control reserved to her; she was merely a guest or passenger. Little v. Hackett, 116 U. S. 366, 6 S. Ct. 391, 29 L. Ed. 652. She not only looked and listened when the car stopped, but she continued to look up and down the track from the moment the car started on the track until it was hit. The evidence of any contributory negligence on her part is not so clear that reasonable minds would reach the conclusion that she was negligent. It is clearly a question for the jury.

For these reasons, the judgments should be reversed and new trials ordered.